Page 1

1          IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF OHIO
2                  EASTERN DIVISION
3             ~~~~~~~~~~~~~~~~~~~~~
4    JILL M. BECKMAN,
5
                   Plaintiff,
6
7       vs.              Case No. 1:18-cv-00985
8
     GUARDANT HEALTH, INC.,
9
10                 Defendant.
11
              ~~~~~~~~~~~~~~~~~~~~~
12
                   Deposition of
13                 JILL BECKMAN
14
                 February 11, 2019
15                     9:59
16
                   Taken at:
17             Littler Mendelson, PC
                 Oswald Centre
18             1100 Superior Avenue
               East, 20th Floor
19             Cleveland, Ohio
20             Tracy Morse, RPR
21
22
23
24
25

Page 2

1   APPEARANCES:

2

        On behalf of the Plaintiff:

3

            Ziegler Metzger LLP, by
4           STEPHEN M. BALES, ESQ.
            1111 Superior Avenue
5           Suite 1000
            Cleveland, Ohio  44114
6           216-781-5470
            sbalesazieglermetzger.com

7

8       On behalf of the Defendant:

9           Littler Mendelson, PC, by
            SHANNON M. BYRNE, ESQ.
10          AMY RYDER WENTZ, ESQ.
            Oswald Centre
11          1100 Superior Avenue
            East, 20th Floor
12          Cleveland, Ohio  44114
            216-696-7600
13          sbyrne@littler.com
            awentz@littler.com

14
                    ~ ~ ~ ~ ~

15

16

17

18

19

20

21

22

23

24

25

Page 3

1                       TRANSCRIPT INDEX
2

APPEARANCES............................    2
3

INDEX OF EXHIBITS......................    4
4

EXAMINATION OF JILL BECKMAN
5       By MS. BYRNE...........................    6
6       REPORTER'S CERTIFICATE.................  157
7       EXHIBIT CUSTODY
        EXHIBITS RETAINED BY COURT REPORTER, 1-24

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1                     INDEX OF EXHIBITS
 2    NUMBER              DESCRIPTION         MARKED
 3    Exhibit 1   Jill M. Beckman Resume....... 18
                  Bates GH-BAYER 0002-0003
 4    Exhibit 2   9/8/2016 Employee........... 40
                  Confidential Information and
 5                Invention Assignment
                  Agreement With Attachments,
 6                Bates GH 000637-000645
      Exhibit 3   7/16/17 Email Trail Between.. 63
 7                Jill Beckman Muneesh Tewari
                  And Casey Jenkins, Bates
 8                Numbers GH 000049-000050
      Exhibit 4   4/13/16-5/8/2017 Email..... 65
 9                Trail Between Jill Beckman,
                  DL-Northeast-Sales-Team,
10                Alicia Madison and Shelley
                  Gaidos With Attachment, Bates
11                Numbers GH 000045-000048
      Exhibit 5   5/5/2017 Email To Alicia..... 67
12                Madison From Jill Beckman,
                  Bates GH 000714-000715
13    Exhibit 6   5/12/2017 Letter To Jill..... 76
14                Beckman From Casey Jenkins
                  With Attachment, Bates
                  GH 000704 -000705
15    Exhibit 7   5/8/2017 Email To Casey Khoo. 81
16                From Jill Beckman, Bates
                  Number GH 000077
      Exhibit 8   5/25/2017 Email To Steven.... 83
17                Collora From Jill Beckman,
                  Bates Numbers GH 000706
18    Exhibit 9   5/25/2017 Email To Jill...... 85
                  Beckman From Jill Beckman,
19                Bates Numbers GH 000296
      Exhibit 10  8/8/2017 Email To Alicia..... 86
20                Madison From Jill Beckman,
                  Bates Numbers GH 000709
21    Exhibit 11  9/10-11/2017 Email Trail..... 91
                  Between Bryan Lorenz, Kelli
22                Schafer, Leeann Barlow, Jill
                  Beckman and Pamela Olsen,
23                Bates Numbers GH 000697-699
      Exhibit 12  9/8/2017 Letter To Jill...... 95
24                Beckman From Amelia Merrill
                  With Attachments, Bates
25                Numbers GH 000372-000377
```

Page 5

```
 1                    INDEX OF EXHIBITS
 2     NUMBER              DESCRIPTION          MARKED
 3     Exhibit 13  10/2/2017 Letter To Jill..... 99
                   Beckman From Amelia Merrill
 4                 With Attachment, Bates Number
                   GH 000210-000214
 5     Exhibit 14  10/6/2017 Email to Casey.....106
                   Jenkins, Jill Beckman From
 6                 Adobe Sign With Attachments,
                   Bates GH 0000017-000022
 7     Exhibit 15  11/30-12/5/21017 Email Trail.119
                   Between Chris Melbourne,
 8                 Bryan Mele and Margaret
                   Blackwell, Bates Numbers
 9                 GH-BAYER 0031-0035
       Exhibit 16  10/29-30/17 Email Trail......121
10                 Between Petros Grivas and
                   Jill Beckman With Attachment,
11                 Bates Beckman 000269-000270
       Exhibit 17  12/6/2017 Letter To Jill.....123
12                 Beckman From Chris Melbourne,
                   Bates GH Bayer 0011-0012
13     Exhibit 18  Background Check Information.125
                   Request, Bates Numbers
14                 BECKMAN 000325-000326
       Exhibit 19  12/14-18/2017 Email Trail....126
15                 Between The People Team,
                   Courtney Metzgar and Aisha
16                 Cook With Attachment, Bates
                   Numbers GH 000398-000402
17     Exhibit 20  12/6/2017 Justifacts........128
                   Credential Verification,
18                 Inc., Bates Number BECKMAN
                   000342-000351
19     Exhibit 21  12/27/2017 Letter To Jill....139
                   Beckman From Bayer U.S., LLC,
20                 Bates Number GH-Bayer 0026
       Exhibit 22  12/18-30/2017 Email Trail....141
21                 Between The People Team,
                   Amelia Merrill, Davina Patel
22                 And Jill Beckman, Bates
                   Numbers 000001-000002
23     Exhibit 23  1/11/2018 Letter To Jill.....147
                   Beckman From Julia Henderson,
24                 Bates Number Beckman 000341
       Exhibit 24  Amended Complaint............148
25
```

Page 6

1          JILL BECKMAN, of lawful age, called for

2     examination, as provided by the Federal Rules

3     of Civil Procedure, being by me first duly

4     sworn, as hereinafter certified, deposed and

5     said as follows:

6               EXAMINATION OF JILL BECKMAN

7     BY MS. BYRNE:

8          Q.    Good morning, Ms. Beckman.

9          A.    Good morning.

10         Q.    Can you state and spell your full

11    name for the record.

12         A.    Sure.  It's Jill Melissa Beckman,

13    J-i-l-l, M-e-l-i-s-s-a, B-e-c-k-m-a-n.

14         Q.    And my name is Shannon Byrne.  I

15    represent Guardant Health in the lawsuit that

16    you filed.  We are here today for the purpose

17    of taking your deposition pursuant to an

18    agreement and notice to your counsel.  Have you

19    ever been deposed before?

20         A.    No.

21               THE WITNESS:  Wait.  I'm already

22    looking at you and I can't look at you.

23         A.    I don't understand the question.

24         Q.    Have you ever been deposed in a

25    lawsuit before?

Page 24

1    that's inaccurate, because it was through -- I
2    was paid through October, but I was -- I was
3    paid through October 3, but I was terminated, I
4    believe September 18 --
5         Q.    Okay.
6         A.    -- so that -- I don't know if that
7    needs to be changed or not.
8         Q.    Okay.  I see there is a gap between
9    May 2016 and September 2016.  Can you tell me
10   what you were doing in between those dates?
11        A.    Yes.  Can you repeat the dates,
12   please?
13        Q.    Yeah.  May 2016, you left
14   AstraZeneca.
15        A.    Right.
16        Q.    And then September 2016, you
17   started at Guardant Health and I just asked you
18   what you were doing in between those two dates.
19        A.    Okay.  So I did start a new
20   position with a company called Helsinn that
21   lasted very briefly because of a change they
22   made.  So you don't need the details, until you
23   want me to share them, but I started with
24   Helsinn, for I believe it was only two
25   months --

Page 25

1        Q.     Okay.

2        A.     -- I also helped my -- our

3   sister-in-law, my husband's sister-in-law.  His

4   brother had prostate cancer, so I was also

5   helping them.  I believe he passed away in

6   July, if I'm not mistaken, and then I went back

7   to work.

8        Q.     Why isn't Helsinn on your resume?

9        A.     Because they lied to me, so it

10  was -- I interviewed with one manager and then

11  they had me report to another manager, so it

12  was a bait-and-switch.  I literally was

13  supposed to work for one and then they had me

14  report to another and so it was not a good fit.

15       Q.     But you previously testified that

16  your resume was accurate, correct?

17       A.     It is accurate.  It might be

18  missing Helsinn, but it doesn't add any value

19  to my background.  There's no value to Helsinn

20  at all on this resume.

21       Q.     Okay.  So I just want to talk a

22  little bit about your employment at Helsinn.

23  And that's Helsinn Therapeutics, correct?

24       A.     Yes.

25       Q.     So you said you worked there for

Page 26

1    two months.  Do you remember the exact dates?

2         A.    I believe it was two months.  And I
3    don't recall.

4         Q.    But did you start in May 2016?

5         A.    I don't recall.

6         Q.    Okay.  And what was your job title,
7    while you were at Helsinn?

8         A.    I don't remember.

9         Q.    Even though we are just talking
10   about going back to 2016, you don't remember
11   your job title?

12        A.    Yes.  You can tell they vary from
13   every single position I've held.  They change
14   with each organization.

15        Q.    Did your job title ever change,
16   while you were at Helsinn?

17        A.    No.

18        Q.    Do you remember what your job
19   duties were at Helsinn?

20        A.    It was sales.

21        Q.    Do you remember what your sales
22   territory was?

23        A.    I don't recall.  Probably
24   Cleveland, but I'm not positive.

25        Q.    And was your departure involuntary?

Page 27

1          A.     It was a mutual separation.

2          Q.     Were you ever disciplined, while

3     you were at Helsinn?

4          A.     No, not to my recollection.  Like a

5     letter?  Are you talking about a warning?

6          Q.     Any kind of discipline.  Were you

7     ever verbally counseled?

8          A.     Yes.

9          Q.     Okay.  Can you tell me about that?

10         A.     Sure.  I'm sorry.  I took notes --

11    oh, my god, this will make me cry.  I took

12    notes in meetings, which I've done for 15

13    years.  And it's typically encouraged with most

14    pharmaceutical companies that I worked for, to

15    take notes so you learn and I was chastised for

16    taking notes in our meeting.  I also could not

17    get onto the Internet and I tried my manager's

18    hotspot, I think it's called.  I tried to get

19    on the Internet with his hotspot.

20         He was trying to help me get onto the

21    Internet, so I could participate in the

22    exercise the team was doing.  I could not get

23    onto the Internet.  So I did a little bit of

24    work.  It was a half hour before the end of the

25    meeting, I shut my computer down just because I

Page 28

```
 1   couldn't get on the Internet.  I couldn't do
 2   the exercise.  So I think I excused myself to
 3   the bathroom and was also, I guess coached for
 4   that or -- it wasn't discipline but it was
 5   discussed.
 6           Q.    Okay.  Any other verbal coaching?
 7           A.    Not that I recall, no.  Or I don't
 8   remember.
 9           Q.    And no written discipline, while
10   you were at Helsinn?
11           A.    I don't remember.  I don't believe
12   so.
13           Q.    Was this all one coaching session
14   or were these two separate coaching sessions?
15           A.    That was one.
16           Q.    And who coached you?
17           A.    My manager.
18           Q.    And who was your manager?
19           A.    Frank.  I don't remember his last
20   name.
21           Q.    Okay.  And what did Frank tell you,
22   when you were coached?
23           A.    That I should not take notes in
24   meetings.  And that I should not have shut my
25   computer down before the end of the meeting.
```

Page 29

```
1         Q.     Did he say why?

2         A.     No.

3         Q.     And how did you respond?

4         A.     I said, "Okay."

5         Q.     And that's all you said in

6    response?

7         A.     I don't recall.

8         Q.     Okay.  Did you talk to anybody else

9    about this coaching event?

10        A.     I don't recall.

11        Q.     You didn't send any emails related

12   to this coaching to anyone else?

13        A.     I may have with -- I may have with

14   HR perhaps trying to get help --

15        Q.     Okay.

16        A.     -- I don't remember, but I believe

17   I tried to reach out to HR just -- I just felt

18   he was -- I have no idea why he's -- yeah.  I

19   mean, he was terminated from JSK.  He was

20   terminated from Helsinn.  He had a horrible

21   reputation, which is why when I found out I was

22   reporting to him, I was highly disappointed.

23   And I knew right from the very beginning, it

24   was not going to be two months, which is why it

25   was only two months.  Most of it was training.
```

Page 30

```
1        Q.    So who did you express your
2   discontent to about having to report to him?
3        A.    No one.
4        Q.    When did this coaching happen?
5        A.    It was after a national meeting.
6        Q.    Do you remember the month?
7        A.    No.
8        Q.    Was it in the middle of your
9   employment?
10       A.    Yes.
11       Q.    And so after the coaching, you kept
12  working at Helsinn?
13       A.    Briefly, maybe.  I don't -- it was
14  only two months overall.  I don't recall.
15       Q.    So tell me about your mutual
16  decision to leave Helsinn.
17       A.    So I got a phone call that just
18  said, "This isn't working well" -- I got a
19  phone call to meet my manager.  And when I got
20  there, he said, "This isn't working out," and I
21  said, "I agree," and he handed me the
22  separation agreement and I signed it and --
23       Q.    Was anyone else present at the
24  meeting?
25       A.    He had, I believe -- I think her
```

Page 54

1        Q.     So what does, "Downsize," mean for

2    a territory?

3        A.     That it decreased in size.  I lost

4    part -- I lost part of the geography.  I lost

5    Michigan.  So it went from Michigan, Cleveland

6    and Pittsburgh to just Cleveland and

7    Pittsburgh.  It was downsized.

8        Q.     What happened to Michigan?

9        A.     A new rep took over.

10       Q.     Because the sales force was

11   expanding, correct?

12       A.     I don't know.

13       Q.     So they hired a new rep to take

14   over the part of your territory that split off,

15   correct?

16       A.     They hired a new rep to take over

17   Michigan.

18       Q.     Which split off from your

19   territory, correct?

20       A.     Yes.

21       Q.     So the company wasn't downsizing.

22       A.     No.

23       Q.     So how was your territory

24   downsizing?

25                  MR. BALES:  Objection.  Asked and

```
                                          Page 63
 1    Michigan that somebody else was going to be
 2    taking over their account?
 3          A.    I was asked to notify customers of
 4    the new account rep and so I made those
 5    introductions to not just -- not one specific
 6    person but multiple, multiple doctors, nurses,
 7    introducing Kelli to them.
 8          Q.    And what did you say, when you
 9    introduced Kelli?
10          A.    I don't remember.
11                       -  -  -  -  -
12                (Thereupon, Deposition Exhibit 3,
13                 7/16/2017 Email Trail Between Jill
14                 Beckman Muneesh Tewari and Casey
15                 Jenkins, Bates Numbers GH
16                 000049-000050, was marked for
17                 purposes of identification.)
18                       -  -  -  -  -
19          Q.    So I'll let you review Exhibit 3.
20          A.    Okay.
21    Okay.
22          Q.    Can you identify this document?
23          A.    No.
24          Q.    Going down about halfway where it
25    says, "On July 16, 2017, at 3:12 p.m., Jill
```

Page 64

1   Beckman...wrote...."  Do you know see what I'm

2   talking about?

3       A.    Yes.

4       Q.    Do you recall writing the text

5   that's underneath that line?

6       A.    Yes.

7       Q.    Who is Dr. Alva and Dr. Tewari?

8       A.    They were instrumental in the

9   collaboration and the contract that was agreed

10  upon between those doctors, Steven Collora,

11  Alicia.  They were instrumental in those

12  meetings and moving forward with the

13  collaboration with U of M.

14      Q.    And by, "U of M," you're referring

15  to University of Michigan?

16      A.    Yes.

17      Q.    Can you read what you told Dr. Alva

18  and Dr. Tawari in just that first paragraph?

19      A.    Sure.

20      "Hi Dr. Alva and Dr. Tewari,"

21      "As Guardant Health is rapidly growing,

22  we are expanding WI-sales force to better serve

23  your account, and recently hired an account rep

24  for the Michigan area."

25      Q.    And did you tell them anywhere in

Page 65

1   this email that you were being downsized?

2        A.    No.

3        Q.    Okay.  But you did tell them about

4   expanding the sales force, correct?

5        A.    Yes.

6        Q.    And hiring a new rep, correct?

7        A.    No.

8        Q.    Where it says, "And recently hired

9   an account rep for the Michigan area."

10       A.    I missed that.  I'm sorry.  "Let me

11  introduce you" -- I apologize.  That's my

12  mistake.  Yes.

13       Q.    Okay.  And we can agree that you

14  drafted that email?

15       A.    Yes.

16            MS. BYRNE:  Can we take a quick

17  break?

18            MR. BALES:  Yes.

19            MS. BYRNE:  Let's go off the record

20  for a little bit.

21                 (Recess taken.)

22                 -  -  -  -  -  -

23            (Thereupon, Deposition Exhibit 4,

24            4/13/2017-5/8/2017 Email Trail

25            Between Jill Beckman, Alicia

Page 95

1   month of not hitting those goals.

2        Q.    Did you understand that the company

3   didn't want you to talk about other employees

4   getting fired to other Guardant employees?

5        A.    On that phone call?

6        Q.    Yeah.

7        A.    I don't remember.

8        Q.    Did you ever understand that?

9        A.    I did with the first and final

10  written warning.

11       Q.    So what would have changed at the

12  time of the phone call, after the first and

13  final written warning?

14       A.    Nothing.

15       Q.    So you still understood that you

16  weren't supposed to send emails discussing

17  people from the company getting fired?

18       A.    I didn't think about it.  It was --

19  it was a mistake.  I mean, I didn't think about

20  it.  I honestly thought I was terminated for

21  talking about sales goals.

22                   -   -   -   -   -

23                (Thereupon, Deposition Exhibit 12,

24                9/8/2017 Letter To Jill Beckman From

25                Amelia Merrill With Attachments,

```
                                           Page 96

 1            Bates Numbers GH 000372-000377, was

 2            marked for purposes of

 3            identification.)

 4                 -  -  -  -  -

 5       Q.    So I'll let you review what's been

 6   marked as Exhibit 12.

 7            MR. BALES:  Shannon, if you're

 8   about to go on to a different topic --

 9       This can be off the record.

10        (Discussion held off the record.)

11   BY MS. BYRNE:

12       Q.    So do you recognize Exhibit 12?

13       A.    Yes.

14       Q.    And can you identify this document?

15       A.    I don't understand the question.

16       Q.    What is this document?

17       A.    There's two documents.

18       Q.    What are the two documents?

19       A.    They're separate documents --

20   documents to my -- from my perspective.

21   There's a document dated September 18 addressed

22   to me that details -- not details.  There's a

23   document dated September 18, addressed to me

24   stating, "Private and confidential letter of

25   termination."  And then there's a document
```

Page 97

1    dated October 2 of 2017, addressed to me

2    entitled, "Terms of Separation."

3         Q.    What is the first document that you

4    see on the page Bates labeled GH 000372?

5         A.    It's a letter of termination.

6         Q.    Okay.  And are you the recipient of

7    this document?

8         A.    Yes.

9         Q.    Do you recall receiving this

10   document?

11        A.    Yes.

12        Q.    And it's dated at the bottom as

13   September 20, 2017, correct?

14        A.    Yes.

15        Q.    So let's turn to the next page,

16   GH 000373.

17        A.    Yes.

18        Q.    Do you see that page?

19        A.    Yes.

20        Q.    And what is this document?

21        A.    This is the letter I received on

22   October 5.  It was addressed to me and it

23   details some of the terms of my separation.

24        Q.    How do you know you received this

25   on October 5?

Page 98

1      A.    Because there's a timeline at the
2  end of it.  It's not actually on here.  I have
3  the timeline.  We have the timeline --
4  actually, this is a different one.  Wait a
5  minute, this is a different one.  I thought --
6  this was the draft.  I apologize.  That's my
7  mistake.  I reviewed the actual letter that was
8  sent on October 5 --
9      Q.    Okay.  So this is --
10     A.    -- this is a draft.  I apologize.
11 My mistake.
12     Q.    So this is a draft of the document
13 entitled, "Terms of Separation," correct?
14     A.    Yes.
15     Q.    And you received this on
16 September 20, 2017, correct?
17     A.    Yes.
18     Q.    Along with the first page, which
19 was the letter of termination, correct?
20     A.    I don't know.
21     Q.    So is there any basis to dispute
22 that you received all of these pages when they
23 were sent to you on September 20, 2017?
24     A.    Okay.  Now I see what the timeline,
25 that they were both -- I mean, this states they

Page 99

1    were both sent together.  So will you, please,

2    repeat the question?

3         Q.    So can we agree the employee

4    separation letter and the draft separation

5    agreement were sent to you together on

6    September 20, 2017?

7         A.    Yes.

8         Q.    And this was approximately two

9    weeks before your employment ended, correct?

10        A.    Approximately, yes.

11                      -  -  -  -  -

12               (Thereupon, Deposition Exhibit 13,

13               10/2/2017 Letter To Jill Beckman

14               From Amelia Merrill With Attachment,

15               Bates Number GH 000210-000214, was

16               marked for purposes of

17               identification.)

18                      -  -  -  -  -

19        Q.    So I'll let you review what's been

20    marked as Exhibit 13.

21        A.    Okay.

22        Q.    Can you identify this document?

23        A.    Yes.  It's a letter dated October 2

24    addressed to me that's entitled, "Terms of

25    Separation," and has some of my terms of

Page 100

1   separation in it.

2       Q.    When did you receive this document?

3       A.    This was October 5, 2017.

4       Q.    And you reviewed this document?

5       A.    Yes.

6       Q.    Did you ask for any changes to be

7   made to this document?

8       A.    I don't remember.

9       Q.    Do you have any reason to believe

10  you asked for any changes to be made to this

11  document?

12      A.    I asked Casey, because I received

13  the separation documents contemporaneously, and

14  I asked Casey why my termination date had

15  changed from October 2 to October 3. So this

16  document is inaccurate. It states,

17  "October 2," when my date was actually

18  October 3 detailed in the separation documents.

19  So that was the one question I asked for

20  clarification.

21      Q.    Okay. And you signed this document

22  on October 6, 2017, correct?

23      A.    Yes.

24      Q.    Looking at the second page, Beckman

25  000211, at paragraph 6, there was a waiver of

1    claims, correct?

2          A.    Yes.

3          Q.    And you understood what this meant?

4          A.    I don't remember.

5          Q.    Did you ask anybody what this

6    meant?

7          A.    No.

8          Q.    You were agreeing not to sue the

9    company for anything related to your employment

10   up to the date you signed this agreement,

11   correct?

12         A.    I don't know.

13         Q.    So let's turn to the second-to-last

14   page, Beckman 000213 and paragraph 14 entitled,

15   "Review Of Separation Agreement."  Do you see

16   that?

17         A.    Yes.

18         Q.    Okay.  In the second line, it

19   says -- well, I'll just read the whole thing.

20   "You understand that you may take up to

21   twenty-one (21) days to consider this agreement

22   and, by signing below, affirm that you were

23   advised to consult with an attorney prior to

24   signing this agreement."  Is that what the

25   document says?

Page 102

1      A.    Yes.

2      Q.    Did you consult with an attorney?

3      A.    No.

4      Q.    But you were advised to consult

5   with an attorney?

6      A.    Yes.

7      Q.    Let's look at the third page, Bates

8   labeled Beckman 000212 at paragraph 10,

9   "Confidentiality."  Did you understand this

10  provision?

11     A.    I don't remember.

12     Q.    How much were you paid in exchange

13  for signing this agreement?

14     A.    I don't understand the question.

15     Q.    Were you paid money, in exchange

16  for signing this agreement?

17     A.    I received severance pay.  That was

18  detailed in the separation documents.

19     Q.    How much did you receive?

20     A.    I don't remember.

21     Q.    Okay.  Let's turn to paragraph 12

22  entitled, "Entire Agreement."  Can you read

23  that paragraph for me?

24     A.    Sure.

25           "This agreement constitutes the entire

Page 106

1    answered.

2          Go ahead.

3          A.    No.

4          Q.    And then just going back to when I

5    asked if you received any payment in exchange

6    for signing this document, I want to focus on

7    paragraph 3 and after that little (a).  It says

8    they will pay you a total of four weeks base

9    pay.  So that's above and beyond just the

10   payment of your wages, correct?

11         A.    Yes.

12         Q.    And paragraph 2 is referring to the

13   payment of wages.

14         A.    Yes.

15                    -   -   -   -   -

16              (Thereupon, Deposition Exhibit 14,

17              10/6/2017 Email to Casey Jenkins,

18              Jill Beckman From Adobe Sign With

19              Attachments, Bates Number GH

20              0000017-000022, was marked for

21              purposes of identification.)

22                    -   -   -   -   -

23         Q.    So I'll let you review what's been

24   marked as Exhibit 14.

25         A.    Okay.  Thank you.

Page 107

1      Q.    Can you identify this document?

2      A.    These are the separation documents

3   sent to me on October 5.

4      Q.    Okay.  Is this the first time you

5   received the separation documents?

6      A.    I don't remember.

7      Q.    Do you have evidence that you

8   received these before October 5?

9      A.    I don't know if they sent me a

10  draft similar to the letter.  That's, I guess

11  what I'm saying.  I don't know if they sent me

12  a draft prior to sending these, but these are

13  the separation documents that I received again

14  at the same time as of the separation letter.

15     Q.    Do you have a copy of the draft of

16  any separation documents?

17     A.    I don't know.  I don't believe so.

18  I don't know.  I don't remember.

19     Q.    Did you produce a draft of the

20  separation documents?

21     A.    I don't know.  If I had one, I

22  would have produced it.  I'm not trying to be

23  difficult.  If I had a draft, I would have.

24  That's why I don't know if I had a draft or

25  not, but I don't know.

Page 108

```
 1        Q.     So you haven't produced a draft of

 2   the separation documents.  So can we agree that

 3   there's no draft of the separation documents?

 4               MR. BALES:  Objection.

 5        You can answer.

 6        A.     Yes.

 7        Q.     So you received the separation

 8   documents, which are Exhibit 14, in a second

 9   email on October 5, 2017, correct?

10        A.     Yes.

11        Q.     Did you sign these documents, after

12   you signed the separation agreement?

13        A.     Yes.

14        Q.     Let's look at the second page,

15   which is Bates labeled, GH 000018.

16        A.     Okay.

17        Q.     Can you identify this document?

18        A.     It reads, "Acknowledgment of

19   Separation Documents."

20        Q.     And did you sign this document?

21        A.     Yes.

22        Q.     In here you're asked to acknowledge

23   receiving your final paycheck, correct?

24               MR. BALES:  Object to the form.

25        You can answer.
```

Page 109

1      A.    Yes.

2      Q.    And you're acknowledging that you

3  received your final wage payment for all hours

4  worked including any accrued PTO, correct?

5      A.    Yes.

6      Q.    And then the next page, GH 000019.

7  Can you identify this document?

8      A.    It says, "Notice to Employee As to

9  Change in Relationship."

10     Q.    Okay.  And you signed this document

11  on October 6, 2017.

12     A.    Yes.

13     Q.    Right above your signature line, it

14  says, "I received a copy of this notice."  Is

15  that correct?

16     A.    It reads that, but it's inaccurate.

17  It was emailed to me on October 5.

18     Q.    Underneath your actual signature,

19  does it say, "October 6, 2017"?

20     A.    Can you repeat the question?

21     Q.    So under your signature, it's

22  written, "October 6, 2017," correct?

23     A.    Yes.  I believe that's when I

24  signed it.  That's when I signed this document.

25     Q.    Okay.  Can you identify the third

Page 110

1   page, Bates labeled GH 000020?

2          A.    It's final paycheck acknowledgment.

3          Q.    And you signed this document on

4   October 6, 2017.

5          A.    Yes.

6          Q.    Let's go back to the prior page,

7   which was the notice to employee as to change

8   in relationship, Bates labeled GH 000019.

9          A.    Okay.

10         Q.    Do you see where it says, "Your

11  employment status has changed for the following

12  reason: Terminated due to violating a first and

13  final written warning"?

14         A.    Yes.

15         Q.    You signed this document, correct?

16         A.    Yes.

17         Q.    So you agreed that you were

18  terminated due to a violation of the first and

19  final written warning.

20         A.    Yes.

21         Q.    And did this have anything to do

22  with your territory?

23         A.    No.

24               THE WITNESS:   Can we take a break

25  so I can go to the bathroom, please?

```
                                        Page 111
 1              MS. BYRNE:      Sure.
 2              THE WITNESS:   Okay.
 3                  (Recess taken.)
 4    BY MS. BYRNE:
 5         Q.    Okay.  Now I'm going to move into,
 6    you know, the Bayer timeframe with your
 7    application, interview and all that.  So when
 8    did you apply at Bayer?
 9         A.    I don't remember.  Well, there were
10    multiple applications, too.
11         Q.    Like approximately when was your
12    first application?
13         A.    I don't remember if it was before
14    being terminated or after, because I was
15    looking once -- yeah, I don't remember.
16         Q.    So it would have been after
17    September 18?
18         A.    It would have been after my
19    territory changed.  Once my territory changed,
20    I knew I was -- yeah.
21         Q.    So there was a first application.
22    And was there another application?
23         A.    Yes.  So there was a prostate
24    cancer application and a TKI application.
25         Q.    And did you get an interview as a
```

Page 118

1      Q.    Okay.  And did you discuss Guardant
2  Health at the second interview with Tim Holmes?
3      A.    Uh-huh.
4            MR. BALES:  You have to answer
5  "Yes," or, "No."
6      A.    Oh, I'm sorry.  No.  Thank you.
7      Q.    So you didn't discuss Guardant
8  Health at either one of the TKI interviews?
9      A.    No.
10      Q.    So let's go back to Exhibit 1,
11  which is your resume.  So this was the resume
12  that you gave to Bayer, correct?
13      A.    I don't know.
14      Q.    Okay.  Do you want to review it?
15  I'll represent to you that this is what we
16  received from Bayer in response to --
17      A.    I haven't -- I have a couple
18  resumes and I think I shortened it from three
19  pages down to two.  So I have no idea what I
20  provided to Bayer, but it would have been
21  similar information, just consolidated.
22      Q.    We went over this, but -- so when
23  you applied to Bayer, the resume you had did
24  not have Helsinn Therapeutics on it, correct?
25      A.    Correct.

Page 119

1      Q.    Did you tell them you worked for
2  Helsinn Therapeutics, during your interview?
3      A.    No.
4      Q.    Going to the TKI interviews.  Did
5  either one of them ask if you were still
6  employed?
7      A.    TKI?
8      Q.    Yeah.  The first -- or not on this
9  document, but going back to the TKI --
10      A.    No --
11      Q.    -- interviews.
12      A.    -- I was surprised.  I mean, I
13  thought they would ask me about Guardant and
14  Demetrius, because we worked together at
15  AstraZeneca.  So, no.
16                    -   -   -   -   -
17              (Thereupon, Deposition Exhibit 15,
18              11/30-12/5/21017 Email Trail Between
19              Chris Melbourne, Bryan Mele and
20              Margaret Blackwell, Bates Numbers
21              GH-BAYER 0031-0035, was marked for
22              purposes of identification.)
23                    -   -   -   -   -
24      Q.    So I'll let you review what's been
25  marked as Exhibit 15.

Page 124

1              GH Bayer 0011-0012, was marked for

2              purposes of identification.)

3                   -   -   -   -   -

4         Q.    So I'll let you review what's been

5    marked as Exhibit 17.

6         A.    Okay.

7         Q.    Can you identify this document?

8         A.    Yes.  This was the offer letter

9    sent to me on December 6 of 2017.

10        Q.    From?

11        A.    From Bayer.

12        Q.    What was your territory going to be

13   for Bayer, with respect to this in this offer

14   letter?

15        A.    It would have been Cleveland.

16        Q.    So the Cleveland area, so UH,

17   MetroHealth, Cleveland Clinic?

18        A.    Yeah.

19        Q.    And was this offer contingent?

20        A.    Yes.

21        Q.    And what was it contingent on?

22        A.    Upon everything noted at the bottom

23   of page 1.

24        Q.    Including a drug test?

25        A.    Yes.

Page 125

1          Q.    And background check?

2          A.    I don't see the test on there, but

3    I know that's true.  Yes, background check,

4    exactly.

5          Q.    Do you know who did the background

6    check?

7          A.    Yes.  Or -- yes.

8          Q.    And who was that?

9          A.    Justifacts.

10         Q.    And how were you notified of that?

11         A.    Via email.

12         Q.    From Bayer or from Justifacts?

13         A.    I received an email from Justifacts

14   on behalf of Bayer.

15         Q.    Do you know when you received that

16   email?

17         A.    No.

18                    -  -  -  -  -

19              (Thereupon, Deposition Exhibit 18,

20              Background Check Information

21              Request, Bates Numbers BECKMAN

22              000325-000326, was marked for

23              purposes of identification.)

24                    -  -  -  -  -

25         Q.    I'll let you review what's been

Page 126

1    marked as Exhibit 18.

2         A.    Okay.

3         Q.    Was this the email you received

4    notifying you of the background check?

5         A.    Yes.

6         Q.    Okay.   Looking at the bottom right

7    above the, "Have a great day," on Beckman

8    000325, do you see reference there to the,

9    "Justifacts applicant portal"?

10        A.    Yes.

11        Q.    Is that what you used to fill out

12   the form for Justifacts?

13        A.    Yes.

14                    -   -   -   -   -

15                (Thereupon, Deposition Exhibit 19,

16                12/14-18/2017 Email Trail Between

17                The People Team, Courtney Metzgar

18                and Aisha Cook With Attachment,

19                Bates Numbers GH 000398-000402, was

20                marked for purposes of

21                identification.)

22                    -   -   -   -   -

23        Q.    I'll let you review what's been

24   marked as Exhibit 19.  Oh, I handed you, sorry,

25   mine.

Page 127

 1        A.     Is this yours?

 2        Q.     Yes.

 3        A.     (Handing.)

 4        Q.     Okay.

 5        A.     Thank you.

 6        Q.     Okay.  So I want to turn to the

 7   third page, which is GH 000400.

 8        A.     Okay.

 9        Q.     Can you identify this document?

10        A.     It states, "Justifacts Background

11   Check Authorization Waiver."

12        Q.     Okay.  Is this your signature at

13   the bottom of the page?

14        A.     Yes.

15        Q.     Did you read this document, before

16   you signed it?

17        A.     Yes.

18        Q.     Did you understand it?

19        A.     Yes.

20        Q.     And then could you read the third

21   line from the top starting with, "I release,"

22   the first full paragraph.

23        A.     "... I release employers and

24   persons named in my application from all

25   liability for any damages on account of his/her

Page 128

1    furnishing said information."

2         Q.    And then above the big, "Agree," in

3    sort of bold lettering, could you read those

4    two lines?

5         A.    "By selecting AGREE below, I

6    acknowledge that I am creating an electronic

7    signature and that I understand it will be

8    legally binding and enforceable as the legal

9    equivalent of a handwritten signature."

10        Q.    You signed this document, correct?

11        A.    Yes.

12        Q.    And then just going to the last

13   page, which is Bates labeled GH 000402, can you

14   identify what this document is?

15        A.    No.

16        Q.    Okay.  I know you didn't fill this

17   out.  All right.

18                    -   -   -   -   -

19              (Thereupon, Deposition Exhibit 20,

20              12/6/2017 Justifacts Credential

21              Verification, Inc., Bates Number

22              BECKMAN 000342-000351, was marked

23              for purposes of identification.)

24                    -   -   -   -   -

25        Q.    So I'll let you review what's been

Page 129

1    marked as Exhibit 20.

2          A.    Okay.  I'm ready.

3          Q.    So can you identify this document?

4          A.    This is the Justifacts document.

5          Q.    And what do you mean by,

6    "Justifacts document"?

7          A.    For employment verification.

8          Q.    So this is your consumer report?

9                MR. BALES:  Objection.  Asked and

10   answered.

11         Q.    You can answer.

12               MR. BALES:  I'm sorry.  You can

13   answer.

14         A.    I don't know.

15         Q.    So did you receive a copy of this

16   report?

17         A.    Yes.

18         Q.    When did you receive a copy of this

19   report?

20         A.    On or around -- it was end of

21   December, after my December 27 phone call with

22   Bayer.

23         Q.    Did you request a copy of this

24   report?

25         A.    No.

Page 130

1     Q.     So how did you receive a copy this
2  report?
3     A.     Brian from Bayer HR said it would
4  be sent to me, after our phone call on
5  December 27.
6     Q.     I want to back up.  You had a phone
7  call with Brian from Bayer HR on December 27?
8     A.     Yes.
9     Q.     What did you discuss, during that
10  phone call?
11     A.     He asked me to define,
12  "Misconduct."
13     Q.     And what did you say in response?
14     A.     I described the iPhone mistake.
15     Q.     What do you mean by, "iPhone
16  mistake"?
17     A.     Accidentally copying someone from
18  outside of the company.
19     Q.     And what else was discussed during
20  the phone conversation on December 27?
21     A.     He asked if I was terminated and I
22  said, "Not terminated.  I received a first and
23  final written warning."  Then he asked why I
24  was terminated and I said it was because of a
25  birthday email.

Page 131

1       Q.    And then what else was discussed?

2       A.    That was it.

3       Q.    So why did he send you a copy of

4 the report, which is Exhibit 20?

5       A.    Because he explained -- I'm sorry.

6 He explained that they may be unable to extend

7 an offer.  He stated that my iPhone mistake,

8 anyone could have made, but it's not up to him

9 and that it would be up to the attorneys at

10 Bayer to decide whether or not the offer would

11 move forward.

12       Q.    Was that all that was discussed,

13 during your conversation?

14       A.    I don't remember.  I mean, I want

15 to say, yes, that was the bulk of it, but --

16 only other thing would have been he would have

17 said he was sending the Justifacts report or

18 they were sending the Justifacts report but

19 that was everything.  Yes, it was a brief call

20 right after Christmas basically telling me they

21 may not be able to move forward with the offer.

22       Q.    Did he ask you if you were

23 terminated for misconduct?

24       A.    I don't remember.

25       Q.    But initially you said you were not

Page 140

1      Q.    You don't recall if you talked to
2  Brian first or whether you may have received
3  this before you talked to Brian Mele?
4      A.    No.  I spoke with Brian before
5  receiving this.  That's why I don't know if I
6  got this on the 27th or I got it later, but
7  I -- definitely Brian was my first point of
8  contact in terms of learning what was --
9      Q.    So you did receive this.  You just
10 don't know if it was on December 27, 2017.
11     A.    Yes.
12     Q.    Did you respond to this letter?
13     A.    I don't understand the question.
14     Q.    Well, you're being informed here
15 that, "Based in whole or in part on our hiring
16 criteria, including information recently
17 obtained in a consumer report completed by
18 Justifacts Credential Verification, Inc., BAYER
19 U.S. LLC may be unable to extend an offer of
20 employment to you."
21     So after you received that, did you
22 respond to Bayer?
23     A.    No.  Brian said to me that, based
24 on our phone call, he took copious notes and
25 would provide that to Bayer's attorneys and I

Page 141

1    would hear back from someone in HR as to what

2    their decision was.

3         Q.    Is there anything else from your

4    conversation with Brian Mele that you haven't

5    told me about?

6              MR. BALES:  Object to form.

7         You can answer.

8         A.    I don't remember.

9         Q.    Do you have any notes from your

10   conversation with Brian Mele on December 27,

11   2017?

12        A.    No.

13        Q.    Is there anything that would

14   refresh your recollection as to what you

15   discussed with Brian Mele on December 27, 2017?

16        A.    No.

17                   -   -   -   -   -

18              (Thereupon, Deposition Exhibit 22,

19              12/18-30/2017 Email Trail Between

20              The People Team, Amelia Merrill,

21              Davina Patel and Jill Beckman, Bates

22              Numbers 000001-000002, was marked

23              for purposes of identification.)

24                   -   -   -   -   -

25        Q.    I'll let you review what's been

Page 142

1  marked as Exhibit 22.

2        A.    Okay.

3        Q.    Can you identify this document?

4        A.    Yes.  This is a document that I

5  sent to Guardant on December 30, 2017.

6        Q.    And you sent it to The People Team,

7  Amelia Merrill and Davina Patel, correct?

8        A.    Yes.

9        Q.    Could you read the text of the

10 email?

11       A.    Sure.

12       "Thank you again for responding to

13 Justifacts.  I received the results, and saw

14 that Davina did not follow the below terms of

15 our agreement, and provided additional

16 information about my termination.  Most

17 companies do exactly what is noted below, and

18 do not respond to 'Reason for Leaving' or

19 'Would you Rehire?'  I understand that employee

20 references come through the People Operations

21 Team and cover last employee title, date of

22 hire and date of separation only.  Should I

23 have any questions I am to contact the People

24 Operations Team.

25       "I may not be hired for this new job due

Page 143

1  to Davina stating I was terminated for

2  misconduct.  Will you please respond, and

3  confirm that any future inquiries will cover

4  what is noted above, 'last employee title, date

5  of hire and date of separation only?'

6          "Thank you, Jill."

7          Q.    So you didn't ask Guardant to

8  contact Justifacts and correct their response?

9          A.    No.

10         Q.    Okay.  Did you ask them to contact

11  Bayer and correct the response?

12         A.    No.

13         Q.    Why didn't you ask in this email

14  for them to correct the response they reported?

15         A.    Because Guardant -- I trusted that

16  Guardant would -- I trusted Guardant -- that

17  they would keep their promise in terms of our

18  contract of separation and only provide the

19  neutral information that was stated in our

20  contract of separation, which was salary,

21  title, start date, end date.  They already

22  breached that contract of separation.  They

23  already did the damage.  So there was no

24  purpose in my contacting them and asking them

25  to take another step.  If they had chosen to do

Page 144

1   that on their own, that would have been

2   Guardant's decision, but from my perspective,

3   they already breached the contract and I was

4   possibly at risk of losing my job -- or my

5   offer with Bayer.

6        Q.    But going back to your conversation

7   with Brian Mele on December 27, 2017.  Did he

8   tell you that you were not getting the job?

9        A.    He said they may not be able --

10  they may not be able to extend the offer.

11       Q.    He used, "May"?

12       A.    I don't know.  I don't know the

13  exact verbiage.  He base -- he said it was up

14  to the attorneys whether or not they would move

15  forward with an offer.

16       Q.    So he didn't say you weren't

17  getting the job?

18       A.    No.

19       Q.    Going back to Exhibit 21.  The

20  third line down of the main text says, "Bayer

21  USA LLC may be unable to extend an offer of

22  employment to you," correct?

23       A.    Yes.

24       Q.    It doesn't say, "Will not extend an

25  offer of employment to you," correct?

Page 147

1    contract of separation ever again.

2          I was trying to verify that if they ever

3    have another background check again, based on

4    our contract of separation, that they would not

5    breach that contract a second time.  So that's

6    what I was trying to state.  And they never

7    responded to me.  They never got back to me and

8    said they would not do it again.

9                        -   -   -   -   -

10                  (Thereupon, Deposition Exhibit 23,

11                  1/11/2018 Letter To Jill Beckman

12                  From Julia Henderson, Bates Number

13                  Beckman 000341, was marked for

14                  purposes of identification.)

15                        -   -   -   -   -

16          Q.    I'll let you review what's been

17    marked as Exhibit 23.

18          A.    Okay.

19          Q.    Can you identify this document?

20          A.    Sure.  It's a letter from Bayer

21    dated January 11, 2018, addressed to me.

22          Q.    And did you receive this document?

23          A.    Yes.

24          Q.    In the second paragraph, it says,

25    "You have the right to dispute the accuracy or

1  completeness of any information in your

2  consumer report by contacting Justifacts,"

3  correct?

4      A.    Yes.

5      Q.    Did you contact Justifacts?

6      A.    No.

7      Q.    Did you do anything to dispute the

8  accuracy or completeness of your consumer

9  report?

10     A.    No.

11     Q.    Okay.

12     A.    I'm not taking a break.  I'm just

13  going to stand up for a second because of my

14  back.  Thank you.

15     Q.    Okay.  So why do you think that

16  Bayer didn't hire you?

17     A.    I don't know.

18         MS. BYRNE:  Can we take a quick

19  break?

20         MR. BALES:  Um-hum.

21             (Recess taken.)

22             -  -  -  -  -

23         (Thereupon, Deposition Exhibit 24,

24         Amended Complaint, was marked for

25         purposes of identification.)

Page 152

1      A.      It was in half of the agreement,

2  yes.  It was in the contract of sepa -- the

3  agreement was the separation letter and the

4  separation documents, which made one contract.

5      Q.      And so which portion was it in?

6      A.      In the documents.

7      Q.      In the separation documents?

8      A.      Yes.

9      Q.      Would you change anything you did

10  if you had known that Guardant Health was going

11  to report that you were terminated for

12  misconduct?

13          MR. BALES:  Object to form.

14      You can answer.

15      A.      I don't know.

16      Q.      Now I want to talk about your job

17  search efforts after you stopped working at

18  Guardant Health and after the Bayer stuff

19  happened.  Have you had any other employment,

20  since you worked at Guardant Health?

21      A.      No.

22      Q.      I can tell from sort of the

23  documents you produced and your discovery

24  responses that you were actively looking up

25  until July 2018, correct?

# Jill M. Beckman

**6900 Spencer Lake Road, Medina, Ohio 44256**
**330-242-3773**
**jillbeckman1123@gmail.com**

## PROFESSIONAL PROFILE

Self-directed, results oriented Oncology and Rare Disease Sales Specialist with 15 years of experience in the pharmaceutical industry. Proven record with 9 successful product launches and increasing revenue in the Oncology, Hematology, Surgical, Anesthesia, and Respiratory markets. Effective leader and communicator with expert selling and interpersonal skills. Consistent achievement and recognition for exceeding sales goals and growing market share in highly competitive markets. Strong internal/external relationships based on honesty, integrity, transparency and trusted respect from others.

## PROFESSIONAL EXPERIENCE

### *Guardant Health*

### *Account Executive (September 2016 - October 2017)*

- Ranked 3rd nationally the first 6 months in territory
- Increased sales by 200% the first 6 months in territory
- Managed key accounts in Michigan, Cleveland and Pittsburgh
- Responsible for the sales of Guardant 360, the leader in liquid biopsies
- Educate Oncologists and their teams on the importance of genomic testing; the primary genes associated with lung, breast, prostate cancer, and other solid tumors; Guardant's ordering process; and managed care coverage

### *AstraZeneca Pharmaceuticals*

### *Clinical Oncology Specialist (April 2015 - May 2016)*

- Launched 2 Lung Cancer products for EGFR+ NSCLC patients
- Ranked 1st in the District for Iressa, & 3rd in the District for Tagrisso
- Established quick relationships with Lung Cancer Directors at the Cleveland Clinic and University Hospitals, their Nurse Practitioners, and Nurse Partners, plus other stakeholders to make an immediate impact on the business
- Collaborated with cross-functional peers across the organization including my MSL, Field Reimbursement Manager, Diagnostics Liaison, and other Field Associates to maximize business opportunities and commitments to a shared vision
- Selected by my DSM to be the clinical lead for a triad, and mentor new oncology team members

### *Novartis Pharmaceuticals Corporation*

### *Sr. Respiratory Sales Specialist (December 2012 – April 2015)*



DEFENDANT'S EXHIBIT

GH-BAYER 0002

- President's Club Award Winner 2013 (Ranked #1 of 20 Sales Specialists)
- Achieved 227% of target (WPGA - Weighted Product Goal Attainment) in 2013
- Developed and maintained effective relationships with Cystic Fibrosis Center Directors, Physicians, Nurse Care Coordinators, Nurses, Respiratory Therapists, Social Workers, and other stakeholders to deliver exceptional business results
- Initiated and supported educational events (CF Family Days, Great Strides, and Speaker Programs) to make a difference in the lives of CF patients and their caregivers
- Collaborated with cross-functional peers across the organization including Key Account Managers, Managed Markets, Sales Operations, Marketing, and other Field Associates to maximize business opportunities and commitments to a shared vision

### *Archimedes Pharma*
### *Oncology Sales Specialist (September 2011 – May 2012)*

- Joined a start-up company to launch a product for breakthrough cancer pain
- Key customers included Medical and Radiation Oncologists

### *GlaxoSmithKline Pharmaceuticals (April 2001 – September 2011)*

### *Cancer Center Specialist (October 2010 – September 2011)*

- Recognized as a Sales Leader ranking 3rd nationally
- Achieved 129% of target in 2010
- Managed GSK's oncology portfolio (solid tumor and hematology) for the following disease states and products:  Advanced Renal Cell Carcinoma - Pazopinib, Chronic Lymphocytic Leukemia - Ofatumumab, Chronic ITP - Eltrombopag,, HER2+ Metastatic Breast Cancer - Lapatinib
- Developed and maintained customer relationships with the Cleveland Clinic, University Hospitals, and Ohio State (KOLs in GU, CLL, Benign Hematology, and Breast)

### *Oncology Senior Account Representative (January 2009 – September 2010)*

- Launched 2 Hematology Products successfully
- Awarded "Rep of the Quarter" twice in 2009
- Ranked 24th of 106 representatives nationally in 2009
- Developed and grew a territory that had historically underperformed with GSK
- Managed strategic accounts such as the Cleveland Clinic, University Hospitals, and community cancer centers
- Exceeded sales goals through data analysis, identification of opportunities, strategic planning, and solid execution
- Utilized resources and stakeholders to engage healthcare providers, maximize performance, and achieve goals

### *Oncology & Acute Care Account Representative (April 2005 – December 2008)*

- Diamond Award Winner in 2008 (top 4% nationally, ranked 8th of 229)
- Ruby Award Winner in 2007 (top 20% nationally)
- Sold an injectable (Arixtra) to a diverse customer base:  Oncologists, Orthopedic Surgeons, Vascular Surgeons, Cardiologists, Pulmonologists, and Hospitalists

2 of 8

GH-BAYER 0003

- Increased sales of Argatroban, an IV drug used in the ICU for HIT, a rare disease
- Sold Zofran to anesthesiologists for post-operative nausea & vomiting
- Managed GSK's contracting for the entire product portfolio with Pharmacy Directors and P&T Committee members

### *Pharmaceutical Senior Account Representative (April 2001 – April 2005)*

- Ruby Award Winner in 2004 (top 20% nationally)
- Emerald Award Winner in 2003 (top 10% nationally)

**Selective Achievements:**

2013: President's Club Award Winner
2009: Rep of the Quarter twice
2008: Diamond Award Winner
2007: Ruby Award Winner
2004: Ruby Award Winner
2003: Emerald Award Winner

### EDUCATION AND CERTIFICATIONS

Kent State University   Kent, Ohio
BA in Rhetoric and Communication
Dean's List Senior Year

3 of 8

GH-BAYER 0004

Message

| | |
|---|---|
| **From:** | Jill Beckman [jbeckman@guardanthealth.com] |
| **Sent:** | 7/16/2017 4:51:30 PM |
| **To:** | Casey Jenkins [cjenkins@guardanthealth.com] |
| **CC:** | Alicia Madison [amadison@guardanthealth.com]; Steven Collora [scollora@guardanthealth.com] |
| **Subject:** | FW: Guardant Health New Rep Introduction |

Hi Casey,

I hope you're having a great weekend, and wanted to keep you informed with the Michigan transition.  Below is a communication to Dr. Alva (whom Alicia and I met with originally which launched the collaboration between Guardant Health and University of Michigan), and Dr. Tewari (who helped move the partnership forward).

Alicia was appreciative of my offer to introduce Kelli to key account contacts so this is just a start, and an important one.

Kind Regards,
Jill

**From:** "Tewari, Muneesh" <mtewari@med.umich.edu>
**Date:** Sunday, July 16, 2017 at 3:23 PM
**To:** Jill Beckman <jbeckman@guardanthealth.com>
**Cc:** "Tewari, Muneesh" <mtewari@med.umich.edu>, "Alva, Ajjai" <ajjai@med.umich.edu>, Kelli Schafer
<kschafer@guardanthealth.com>, Alicia Madison <amadison@guardanthealth.com>, Steven Collora
<scollora@guardanthealth.com>
**Subject:** Re: Guardant Health New Rep Introduction

Thank you, Jill — and welcome, Kelli. Looking forward to continuing to move forward with this collaboration.

- Muneesh

On Jul 16, 2017, at 3:12 PM, Jill Beckman <jbeckman@guardanthealth.com> wrote:

Hi Dr. Alva and Dr. Tewari,

As Guardant Health is rapidly growing, we are expanding our sales force to better serve your account, and recently hired an account rep for the Michigan area.

Let me introduce you to Kelli Schafer who is cc'd on this email.

It has been a tremendous honor, and pleasure working with you.   I am leaving you in good hands with Kelli, and we will ensure the transition is seamless for you and your team.

Kind Regards,
Jill

*Jill Beckman*
Oncology Account Executive, Northeast
mobile: +1 330.242.3773
jbeckman@guardanthealth.com

**GUARDANT**HEALTH
Latest Guardant Health News



DEFENDANT'S
EXHIBIT
3

PENGAD 800-631-6989

This message may contain confidential or privileged information. If you are not the intended recipient, please advise the sender immediately by reply email and delete this message and any attachments without retaining a copy. Reviewing, disclosing, distributing, or using the contents of this message is strictly prohibited if you are not the intended recipient. Guardant Health, Inc. prohibits users of our system from sending any e-mail containing anything defamatory, improper or discriminatory.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Electronic Mail is not secure, may not be read every day, and should not be used for urgent or sensitive issues

Confidential

**GUARDANT** HEALTH

September 18, 2017

Attn: Jill Beckman
6900 Spencer Lake Road
Medina, OH 44256

Private & Confidential – Letter of Termination

Dear Jill:

I regret to inform you that your employment with Guardant Health will be terminating effective October 2, 2017, for violation of your final written warning and in accordance with our company's at-will employment policy, which permits either the Company or you to terminate your employment at any time, with or without reason and with or without notice.

From September 18, 2017 to October 2, 2017 you will be working to transition your clients over to Alicia Madison. However, we do not expect you to actively be working your accounts. On October 2, 2017, you will receive your final paycheck for all accrued PTO and wages owed to you, less applicable taxes. Any commission owed to you will be paid separately once calculated around the 15th of the following month. You will also be receiving a Separation Agreement, which you will need to review and sign should you choose to accept the terms of the separation agreement.

At this time, I would like to remind you of your obligations under the Confidentiality Agreement, which you signed on September 8, 2016. Should you violate your obligations relating to confidentiality the Company may terminate you immediately and you will not be eligible to the severance package.

We wish you well in your future endeavors. Should you have any questions please do not hesitate to reach out to the People Team directly by emailing peopleteam@guardanthealth.com

Sincerely yours,

*Amelia E Merrill*
Amelia E Merrill (Sep 20, 2017)

Amelia Merrill

Title: VP, People

Date: Sep 20, 2017

DEFENDANT'S
EXHIBIT
12

PENGAD 800-631-6989

Confidential

**GUARDANT** HEALTH

October 2, 2017

Jill Beckman
6900 Spencer Lake Road
Medina, OH 44256

RE:    TERMS OF SEPARATION

Dear Jill:

This letter confirms the agreement between you and Guardant Health (the "Company") concerning the terms of your separation and offers you the separation compensation we discussed in exchange for a release of claims.

1.    **Separation Date:** As you know, September 18, 2017 was your last day in your role as Account Executive at which time you began to transition your role over to Alicia Madison. Your employment with the Company will cease effective October 2, 2017 after the transition period.

2.    **Acknowledgment of Payment of Wages:** On October 2, 2017 you will receive your final paycheck in the amount of $TBD for all wages, salary, reimbursable expenses, accrued vacation and any similar payments due you from the Company as of the Separation Date.

3.    **Separation Compensation:** In exchange for your agreement to the waiver of claims set forth in paragraph 6, below, the Company agrees to: (a) pay you a total of 4 weeks base pay less applicable state and federal payroll deductions and withholdings; (b) reimburse any premium payments you make to continue your existing health insurance coverage under COBRA for up to 1 month. By signing below, you acknowledge that you are receiving the separation compensation outlined in this paragraph in consideration for waiving your rights to claims referred to in this agreement and that you would not otherwise be entitled to the separation compensation.

4.    **Return of Company Property:** You hereby warrant to the Company that you have returned to the Company all property or data of the Company of any type whatsoever that has been in your possession or control.

5.    **Confidential Information:** You hereby acknowledge that you are bound by the attached agreement dated September 8, 2016, and that as a result of your employment with the Company you have had access to the Company's Proprietary Information (as defined in the agreement), that you will hold all Proprietary Information in strictest confidence and that you will not make use of such Proprietary

Confidential

GH 000373

**GUARDANT** HEALTH™

Information on behalf of anyone. You further confirm that you have delivered to the Company all documents and data of any nature containing or pertaining to such Proprietary Information and that you have not taken with you any such documents or data or any reproduction thereof.

6.    **Waiver of Claims:**  The payments and promises set forth in this agreement are in full satisfaction of all accrued salary, vacation pay, bonus pay, profit-sharing, stock options, termination benefits or other compensation to which you may be entitled by virtue of your employment with the Company or your separation from the Company.  You hereby release and waive any other claims you may have against the Company and its owners, agents, officers, shareholders, employees, directors, attorneys, subscribers, subsidiaries, affiliates, successors and assigns (collectively "Releasees"), whether known or not known, including, without limitation, claims under any employment laws, including, but not limited to, claims of unlawful discharge, breach of contract, breach of the covenant of good faith and fair dealing, fraud, violation of public policy, defamation, physical injury, emotional distress, claims for additional compensation or benefits arising out of your employment or your separation of employment, claims under Title VII of the 1964 Civil Rights Act, as amended, Maryland State Government Article 20-602, et seq., and any other laws and/or regulations relating to employment or employment discrimination, including, without limitation, claims based on age or under the Age Discrimination in Employment Act or Older Workers Benefit Protection Act. By signing below, you expressly waive any benefits of Section 1542 of the Civil Code of the State of California (and/or any other state or Federal provision of similar effect), which provides as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

Notwithstanding the foregoing, this waiver and release of claims does not extend to any rights, which as a matter of law cannot be waived and released.

7.    **Nondisparagement:**  You agree that you will not disparage Releasees or their products, services, agents, representatives, directors, officers, shareholders, attorneys, employees, vendors, affiliates, successors or assigns, or any person acting by, through, under or in concert with any of them, with any written or oral statement.

8.    **Legal and Equitable Remedies:**  You agree that Releasees have the right to enforce this agreement and any of its provisions by injunction, specific performance or other equitable relief without prejudice to any other rights or remedies Releasees may have at law or in equity for breach of this agreement.

9.    **Attorneys' Fees:**  If any action is brought to enforce the terms of this agreement, the prevailing party will be entitled to recover its reasonable attorneys' fees, costs and expenses from the other party, in addition to any other relief to which the prevailing party may be entitled.

Confidential

**GUARDANT** HEALTH

10.  **Confidentiality:**  The contents, terms and conditions of this agreement must be kept confidential by you and may not be disclosed except to your accountant or attorneys or immediate family or pursuant to subpoena or court order.  You agree that if you are asked for information concerning this agreement, you will state only that you and the Company reached an amicable resolution of any disputes concerning your separation from the Company.  Any breach of this confidentiality provision shall be deemed a material breach of this agreement.

11.  **No Admission of Liability:**  This agreement is not and shall not be construed or contended by you to be an admission or evidence of any wrongdoing or liability on the part of Releasees, their representatives, heirs, executors, attorneys, agents, partners, officers, shareholders, directors, employees, subsidiaries, affiliates, divisions, successors or assigns. This agreement shall be afforded the maximum protection allowable under Federal Rules of Evidence Rule 408, Maryland Rules of Evidence Rule 5-408, and/or any other state or Federal provisions of similar effect.

12.  **Entire Agreement:**  This agreement constitutes the entire agreement between you and Releasees with respect to the subject matter hereof and supersedes all prior negotiations and agreements, whether written or oral, relating to such subject matter other than the confidentiality agreement referred to in paragraph 5, above. You acknowledge that neither Releasees nor their agents or attorneys have made any promise, representation or warranty whatsoever, either express or implied, written or oral, which is not contained in this agreement for the purpose of inducing you to execute the agreement, and you acknowledge that you have executed this agreement in reliance only upon such promises, representations and warranties as are contained herein.

13.  **Modification:**  It is expressly agreed that this agreement may not be altered, amended, modified, or otherwise changed in any respect except by another written agreement that specifically refers to this agreement, executed by authorized representatives of each of the parties to this agreement.

Confidential

GH 000375

# GUARDANT HEALTH

14. **Review of Separation Agreement:** You understand that you may take up to twenty-one (21) days to consider this agreement and, by signing below, affirm that you were advised to consult with an attorney prior to signing this agreement. You also understand you may revoke this agreement within seven (7) days of signing this document and that the separation compensation to be provided to you pursuant to Paragraph 3 will be provided only after the end of that seven (7) day revocation period.

If you agree to abide by the terms outlined in this letter, please sign this letter below and also sign the attached copy and return it to me.  I wish you the best in your future endeavors.

Sincerely,

Guardant Health

By: _____
Amelia Merrill
VP, People

READ, UNDERSTOOD AND AGREED:

**Signature:**_____  **Date:**_____
Jill Beckman

GUARDANTHEALTH | 505 Penobscot Drive, Redwood City, CA 94063 USA | 855.698.8887 client services | 888.974.4258 fax | www.guardanthealth.com

Confidential



# Employee Separation Letter and Draft Separation Agreement

Adobe Sign Document History                    09/20/2017

| | |
|---|---|
| Created: | 09/19/2017 |
| By: | Casey Khoo (ckhoo@guardanthealth.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAdVmA5rNKgZ0cbunKPubVjKyjyr0Xt6zc |

## "Employee Separation Letter and Draft Separation Agreement" History

Document created by Casey Khoo (ckhoo@guardanthealth.com)
09/19/2017 - 8:26:23 PM PDT- IP address: 75.40.18.75

Document emailed to Amelia E Merrill (amerrill@guardanthealth.com) for signature
09/19/2017 - 8:27:21 PM PDT

Document viewed by Amelia E Merrill (amerrill@guardanthealth.com)
09/19/2017 - 8:54:36 PM PDT- IP address: 107.77.213.232

Document e-signed by Amelia E Merrill (amerrill@guardanthealth.com)
Signature Date: 09/20/2017 - 6:22:50 AM PDT - Time Source: server- IP address: 71.95.133.201

Signed document emailed to Amelia E Merrill (amerrill@guardanthealth.com), jillbeckman1123@gmail.com, Casey Khoo (ckhoo@guardanthealth.com), and peopleteam@guardanthealth.com
09/20/2017 - 6:22:50 AM PDT

 Adobe Sign

Confidential

**GUARDANT** HEALTH

October 2, 2017

Jill Beckman
6900 Spencer Lake Road
Medina, OH 44256

RE:   TERMS OF SEPARATION

Dear Jill:

This letter confirms the agreement between you and Guardant Health (the "Company") concerning the terms of your separation and offers you the separation compensation we discussed in exchange for a release of claims.

1.   **Separation Date:**  As you know, September 18, 2017 was your last day in your role as Account Executive at which time you began to transition your role over to Alicia Madison. Your employment with the Company will cease effective October 2, 2017 after the transition period.

2.   **Acknowledgment of Payment of Wages:**  On October 2, 2017 you will receive your final paycheck in the amount of $TBD for all wages, salary, reimbursable expenses, accrued vacation and any similar payments due you from the Company as of the Separation Date.

3.   **Separation Compensation:**  In exchange for your agreement to the waiver of claims set forth in paragraph 6, below, the Company agrees to: (a) pay you a total of 4 weeks base pay less applicable state and federal payroll deductions and withholdings; (b) reimburse any premium payments you make to continue your existing health insurance coverage under COBRA for up to 1 month. By signing below, you acknowledge that you are receiving the separation compensation outlined in this paragraph in consideration for waiving your rights to claims referred to in this agreement and that you would not otherwise be entitled to the separation compensation.

4.   **Return of Company Property:**  You hereby warrant to the Company that you have returned to the Company all property or data of the Company of any type whatsoever that has been in your possession or control.

5.   **Confidential Information:**  You hereby acknowledge that you are bound by the attached agreement dated September 8, 2016, and that as a result of your employment with the Company you have had access to the Company's Proprietary Information (as defined in the agreement), that you will hold all Proprietary Information in strictest confidence and that you will not make use of such Proprietary



BECKMAN 000210

**GUARDANT**HEALTH

Information on behalf of anyone. You further confirm that you have delivered to the Company all documents and data of any nature containing or pertaining to such Proprietary Information and that you have not taken with you any such documents or data or any reproduction thereof.

6. **Waiver of Claims:** The payments and promises set forth in this agreement are in full satisfaction of all accrued salary, vacation pay, bonus pay, profit-sharing, stock options, termination benefits or other compensation to which you may be entitled by virtue of your employment with the Company or your separation from the Company. You hereby release and waive any other claims you may have against the Company and its owners, agents, officers, shareholders, employees, directors, attorneys, subscribers, subsidiaries, affiliates, successors and assigns (collectively "Releasees"), whether known or not known, including, without limitation, claims under any employment laws, including, but not limited to, claims of unlawful discharge, breach of contract, breach of the covenant of good faith and fair dealing, fraud, violation of public policy, defamation, physical injury, emotional distress, claims for additional compensation or benefits arising out of your employment or your separation of employment, claims under Title VII of the 1964 Civil Rights Act, as amended, Maryland State Government Article 20-602, et seq., and any other laws and/or regulations relating to employment or employment discrimination, including, without limitation, claims based on age or under the Age Discrimination in Employment Act or Older Workers Benefit Protection Act. By signing below, you expressly waive any benefits of Section 1542 of the Civil Code of the State of California (and/or any other state or Federal provision of similar effect), which provides as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

Notwithstanding the foregoing, this waiver and release of claims does not extend to any rights, which as a matter of law cannot be waived and released.

7. **Nondisparagement**: You agree that you will not disparage Releasees or their products, services, agents, representatives, directors, officers, shareholders, attorneys, employees, vendors, affiliates, successors or assigns, or any person acting by, through, under or in concert with any of them, with any written or oral statement.

8. **Legal and Equitable Remedies:** You agree that Releasees have the right to enforce this agreement and any of its provisions by injunction, specific performance or other equitable relief without prejudice to any other rights or remedies Releasees may have at law or in equity for breach of this agreement.

9. **Attorneys' Fees:** If any action is brought to enforce the terms of this agreement, the prevailing party will be entitled to recover its reasonable attorneys' fees, costs and expenses from the other party, in addition to any other relief to which the prevailing party may be entitled.

BECKMAN 000211

**GUARDANT**HEALTH

10.     **Confidentiality:**  The contents, terms and conditions of this agreement must be kept confidential by you and may not be disclosed except to your accountant or attorneys or immediate family or pursuant to subpoena or court order.  You agree that if you are asked for information concerning this agreement, you will state only that you and the Company reached an amicable resolution of any disputes concerning your separation from the Company.  Any breach of this confidentiality provision shall be deemed a material breach of this agreement.

11.     **No Admission of Liability:**  This agreement is not and shall not be construed or contended by you to be an admission or evidence of any wrongdoing or liability on the part of Releasees, their representatives, heirs, executors, attorneys, agents, partners, officers, shareholders, directors, employees, subsidiaries, affiliates, divisions, successors or assigns. This agreement shall be afforded the maximum protection allowable under Federal Rules of Evidence Rule 408, Maryland Rules of Evidence Rule 5-408, and/or any other state or Federal provisions of similar effect.

12.     **Entire Agreement:**  This agreement constitutes the entire agreement between you and Releasees with respect to the subject matter hereof and supersedes all prior negotiations and agreements, whether written or oral, relating to such subject matter other than the confidentiality agreement referred to in paragraph 5, above. You acknowledge that neither Releasees nor their agents or attorneys have made any promise, representation or warranty whatsoever, either express or implied, written or oral, which is not contained in this agreement for the purpose of inducing you to execute the agreement, and you acknowledge that you have executed this agreement in reliance only upon such promises, representations and warranties as are contained herein.

13.     **Modification:**  It is expressly agreed that this agreement may not be altered, amended, modified, or otherwise changed in any respect except by another written agreement that specifically refers to this agreement, executed by authorized representatives of each of the parties to this agreement.

BECKMAN 000212

# GUARDANT HEALTH

14.   **Review of Separation Agreement:**  You understand that you may take up to twenty-one (21) days to consider this agreement and, by signing below, affirm that you were advised to consult with an attorney prior to signing this agreement. You also understand you may revoke this agreement within seven (7) days of signing this document and that the separation compensation to be provided to you pursuant to Paragraph 3 will be provided only after the end of that seven (7) day revocation period.

If you agree to abide by the terms outlined in this letter, please sign this letter below and also sign the attached copy and return it to me.  I wish you the best in your future endeavors.

Sincerely,

Guardant Health

By: *Amelia E Merrill*
Amelia E. Merrill (Oct 5, 2017)
_____
Amelia Merrill
VP, People

READ, UNDERSTOOD AND AGREED:

Signature: *Jill Beckman*
Jill Beckman (Oct 6, 2017)
_____
Jill Beckman

Date: Oct 6, 2017
_____

BECKMAN 000213

# Separation Agreement

Adobe Sign Document History                          10/06/2017

| | |
|---|---|
| Created: | 10/05/2017 |
| By: | Casey Khoo (ckhoo@guardanthealth.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAZzd2dysP81IoUccU_eJzdB7tSK-JbS_J |

## "Separation Agreement" History

Document created by Casey Khoo (ckhoo@guardanthealth.com)
10/05/2017 - 9:47:15 AM PDT- IP address: 75.40.18.75

Document emailed to Amelia E Merrill (amerrill@guardanthealth.com) for signature
10/05/2017 - 9:48:04 AM PDT

Document viewed by Amelia E Merrill (amerrill@guardanthealth.com)
10/05/2017 - 9:50:01 AM PDT- IP address: 50.233.156.2

Document e-signed by Amelia E Merrill (amerrill@guardanthealth.com)
Signature Date: 10/05/2017 - 9:50:42 AM PDT - Time Source: server- IP address: 50.233.156.2

Document emailed to Jill Beckman (jillbeckman1123@gmail.com) for signature
10/05/2017 - 9:50:43 AM PDT

Document viewed by Jill Beckman (jillbeckman1123@gmail.com)
10/05/2017 - 10:30:09 AM PDT- IP address: 107.77.192.167

Document e-signed by Jill Beckman (jillbeckman1123@gmail.com)
Signature Date: 10/06/2017 - 11:24:59 AM PDT - Time Source: server- IP address: 107.9.182.107

Signed document emailed to Amelia E Merrill (amerrill@guardanthealth.com), Jill Beckman (jillbeckman1123@gmail.com) and Casey Khoo (ckhoo@guardanthealth.com)
10/06/2017 - 11:24:59 AM PDT

 Adobe Sign



**From:** Adobe Sign <echosign@echosign.com>
**Sent:** Friday, October 6, 2017 11:31 AM
**To:** Casey Jenkins; Jill Beckman
**Subject:** Separation Documents between Casey Khoo, Casey Khoo and Jill Beckman is Signed and Filed!

 **Adobe Sign**

## Separation Documents between Casey Khoo, Casey Khoo and Jill Beckman is Signed and Filed!

To: Casey Khoo and Jill Beckman

Attached is a final copy of **Separation Documents**. Copies have been automatically sent to all parties to the agreement.

You can view **the document** in your Adobe Sign account.

Why use Adobe Sign:

• Exchange, Sign, and File Any Document. In Seconds!

• Set-up Reminders. Instantly Share Copies with Others.

• See All of Your Documents, Anytime, Anywhere.

To ensure that you continue receiving our emails, please add echosign@echosign.com to your address book or safe list.



DEFENDANT'S
EXHIBIT
14

PENGAD 800-631-6989

GH 000017

**GUARDANT** HEALTH

## Acknowledgement of Separation Documents

I **Jill Beckman,** acknowledge that I have received the below forms and information upon my departure from Guardant Health. Your last day with Guardant Health will be October 03, 2017. I understand that employee references come through the People Operations Team and cover last employee title, date of hire and date of separation only. Should I have any questions I am to contact the People Operations Team.

Information regarding COBRA will be mailed directly to your home address from our carrier Infinisource. Should you not receive it within 14 business days please contact Casey Jenkins—Manager, People Operations via email on cjenkins@guardanthealth.com. Please note that your 401k contributions will remain with Vanguard unless you wish to roll them over. You will need to contact vanguard directly to do this. (if applicable). Please also note you will have 30 days from date of separation to exercise any vested shares, should you wish to do so please contact Michael Wiley directly via email mwiley@guardanthealth.com . (If applicable)

My forwarding personal details are as follows:

**Mailing Address:** 6900 Spencer Lake Road Medina, OH 44256

**Mailing Address:** Same as above

**Personal Email:** jillbeckman1123@gmail.com

**Phone Number**: 330-242-3773

I acknowledge that I have received my final wage payment for all hours worked including any accrued PTO (if applicable) along with my notice to Employee as to Change in Employment Relationship.

Jill Beckman

**Print Name - Employee**

Oct 6, 2017

**Date**

*Jill Beckman*
Jill Beckman (Oct 6, 2017)

**Signature – Employee**

Casey Jenkins

**Print Name – People Operations**

*Casey Khoo*

**Signature – People Operations**

GH 000018

## NOTICE TO EMPLOYEE AS TO CHANGE IN RELATIONSHIP
### Guardant Health Inc.

**NAME:** Jill Beckman          **Social Security #** ███████████

Your employment status has changed for the following reason:

Terminated due to violating a first and final written warning.

EFFECTIVE DATE:  October 03, 2017

COMMENTS:  For employment verification enquiries, the Company's HR Department will only confirm your start date, your employment end date, and your annual salary as of your last day of employment.

_____

*Casey Khoo*

_____          Oct 5, 2017

Casey Jenkins                                    _____
Manager, People Operations                       DATE

I received a copy of this notice on:  _Oct 6, 2017_____
                                                 DATE

*Jill Beckman*
Jill Beckman (Oct 6, 2017)
_____

**Jill Beckman**

GH 000019



# Final Paycheck Acknowledgment

I, the undersigned recipient, have received the following paycheck(s) from
**Guardant Health Inc.**

1. Allowance Check for wages, payment in full for all hours owed up to and including, October 03, 2017, which includes all accrued PTO less all applicable taxes. Net payment is **$3,844.74**

INITIAL: *JB*

To the best of my knowledge, there is no additional money owed to me by Guardant Health Inc. at the present time.

INITIAL: *JB*

**Name of Recipient: Jill Beckman**

Signature of Recipient *Jill Beckman*
Jill Beckman (Oct 6, 2017)

Date    Oct 6, 2017

Name and title of People Operations:  Casey Jenkins, Manager People Operations

Signature of People Operations *Casey Khoo*

Date    Oct 5, 2017

GUARDANT HEALTH INC.

GH 000020

EXHIBIT C
GUARDANT HEALTH, INC.
TERMINATION CERTIFICATION

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items belonging to Guardant Health, Inc. (the "Company").

I further certify that I have complied with all the terms of the Company's Confidential Information and Invention Assignment Agreement signed by me, including the reporting of any inventions and original works of authorship (as defined therein) conceived or made by me (solely or jointly with others) covered by that agreement.

I further agree that, in compliance with the Confidential Information and Invention Assignment Agreement, I will preserve as confidential all trade secrets, confidential knowledge, data and other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information and other subject matter pertaining to any business of the Company or any of its clients, consultants or licensees.

Date:  Oct 6, 2017

*Jill Beckman*
Jill Beckman (Oct 6, 2017)
Employee's Signature

Jill Beckman
Type/Print Employee's Name

–9–

GH 000021

# Separation Documents

**GUARDANT**HEALTH

**Acknowledgement of Separation Documents**

*[small print text block]*

Adobe Sign Document History                    10/06/2017

| | |
|---|---|
| Created: | 10/05/2017 |
| By: | Casey Khoo (ckhoo@guardanthealth.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAFam4ZhLA8IKS4IMHBQsAUE-3LbPMIS5G |

# "Separation Documents" History

- Document created by Casey Khoo (ckhoo@guardanthealth.com)
  10/05/2017 - 10:15:17 AM PDT- IP address: 75.40.18.75

- Document e-signed by Casey Khoo (ckhoo@guardanthealth.com)
  Signature Date: 10/05/2017 - 10:18:39 AM PDT - Time Source: server- IP address: 75.40.18.75

- Document emailed to Jill Beckman (jillbeckman1123@gmail.com) for signature
  10/05/2017 - 10:18:39 AM PDT

- Document viewed by Jill Beckman (jillbeckman1123@gmail.com)
  10/05/2017 - 10:30:35 AM PDT- IP address: 107.77.192.167

- Document e-signed by Jill Beckman (jillbeckman1123@gmail.com)
  Signature Date: 10/06/2017 - 11:31:47 AM PDT - Time Source: server- IP address: 107.9.182.107

- Signed document emailed to Casey Khoo (ckhoo@guardanthealth.com) and Jill Beckman (jillbeckman1123@gmail.com)
  10/06/2017 - 11:31:47 AM PDT

Adobe Sign



12/06/2017

Dear Jill Beckman,

I am pleased to offer you the position of Oncology Specialty Consultant - Cleveland with Bayer U.S. LLC ("Bayer" or "the Company"), this position will be RESIDENCE based.  You will report directly to Demetrius Thear.

Your anticipated date of employment is dependent on successful completion of the pre-employment requirements. Your tentative start date will be set for 01/08/2018.

**Base Pay and Grade Level:**  You will be assigned to salary grade VS 1.2 and your base annual salary will be $150,000 payable on the Company's normal pay dates (currently bi-weekly). You will not receive a 2018 merit increase as it was calculated into your salary offer, but in the future you will be eligible for merit increases based on the merit guidelines which are published each year.

**Sales Incentive Plans:** In this position, you will be eligible to participate in the Sales Incentive Plan pursuant to all terms and conditions of the applicable plan document.  Your Sales Incentive Plan target will be $39,000.00. The actual award will be determined based on the plan document to be provided by your manager.  To be eligible for the Sales Incentive Plan payment, you must be actively employed as outlined in the plan document.  All variable pay plans are reviewed annually and are subject to revision or discontinuation based on business requirements.

**Company Car:** In this position, you will be eligible to use a company car. In accordance with IRS regulations, your personal usage of a company car will be reported as imputed income to the IRS. You will also be responsible for accurately recording and reporting all personal and business mileage traveled in your company car. Bayer also imposes a $100.00 per month personal usage fee; however, this amount is offset against the imputed income amount described above.

**Benefits:**  Your group benefits will take effect on your first day of employment.  Within your first week of employment, materials will be sent to your Bayer email address detailing enrollment in the Bayer flexible benefits programs including contact information for the Bayer Benefits Center.  You must enroll or waive your benefits enrollment within the first 30 days of your hire date.

**Contingencies:**  The offer is contingent upon the successful completion of the following:

• County and Federal Criminal Check
• Education Verification
• Employment Verification
• Social Security Number Verification
• Department of Motor Vehicle Check
• A review of the Federal Government's exclusion list to ensure that you are not currently suspended, debarred or otherwise ineligible to participate in the Federal healthcare programs or in Federal procurement or non-procurement programs

Further, this offer is contingent upon:



Page 1 of 2

GH-BAYER 0011

• Your completion of Bayer's Employment Agreement, Authorization for Payroll Deductions, Self Disclosure and Code of Conduct Form and Corporate Compliance Policy Certification Form (included with your onboarding paperwork)
• Your ability to provide the necessary documentation to demonstrate identity and work authorization under the Immigration Reform and Control Act of 1986;
• Pre-placement Medical Evaluation, which includes a drug screen [NOTE: You will be contacted by a representative from Bayer's Occupational Health office to schedule your pre-placement physical exam;
• Your satisfactory completion of any required training and certification within the parameters and time frames set forth in any training or curriculum applicable to your position.

**Note:** The Federal Insurance Contributions Act (FICA) is a federal law which requires employers to withhold and pay Social Security and Medicare taxes on the wages paid to employees.  Social Security taxes are withheld from your pay until your earnings reach the annual Social Security wage base tax limit.  In accordance with this law, all new hires, including employees who transfer from one legal entity to another must have their Social Security contributions restarted as of their date of transfer. Therefore, effective the date of your company change, the calculation of your Social Security earnings and corresponding withholdings will restart at zero.  If you have questions regarding this statement, please contact your tax advisor.

**Employment-at-will:**  Bayer maintains an employment-at-will relationship with its employees.  This means that both you and the Company retain the right to terminate this employment relationship at any time and for any reason, without cause or notice.

**Other:** The employment relationship and these terms and conditions of employment will be governed by and construed and enforced in accordance with the laws of the State of New Jersey, without regard to its choice or conflict of law principles.

If you have any questions, please do not hesitate to contact me.  Please note your acceptance of this employment offer in writing by close of business, December 11, 2017.

Congratulations! We are confident that your association with Bayer will be a mutually satisfying experience.

Sincerely,

Chris Melbourne
Bayer Recruiting Team

Offer accepted by: _____  Date: _____

Page 2 of 2

GH-BAYER 0012

Message

| | |
|---|---|
| **From:** | The People Team [peopleteam@guardanthealth.com] |
| **Sent:** | 12/18/2017 9:55:44 AM |
| **To:** | Aisha Cook [acook@guardanthealth.com] |
| **Subject:** | FW: Employment Verification for Jill Beckman |
| **Attachments:** | beckman- waiver.pdf; beckman- people.pdf |

Hi Aisha, could you give Courtney a call to see if she received the info she needs. I thought Davina sent this over, but I'm not seeing anything in the sent folder after 11/8 so I can't tell.

Thanks, Gail

**From:** Courtney Metzgar [mailto:cmetzgar@justifacts.com]
**Sent:** Thursday, December 14, 2017 4:27 PM
**To:** The People Team <peopleteam@guardanthealth.com>
**Subject:** RE: Employment Verification for Jill Beckman

Hello,
Please see attached files.

Thank you for your help

Courtney Metzgar
Verification Specialist
Justifacts Credential Verification
5250  Logan Ferry Road, Murrysville, PA 15668
Phone: 412-712-1593

**From:** The People Team [mailto:peopleteam@guardanthealth.com]
**Sent:** Thursday, December 14, 2017 4:12 PM
**To:** Courtney Metzgar <cmetzgar@justifacts.com>
**Subject:** Re: Employment Verification for Jill Beckman

Hi Courtney,

People Operations sent back Jill Beckman's employment verification already. Please email the form and I can get it back to you.

Thanks

**From:** Courtney Metzgar <cmetzgar@justifacts.com>
**Date:** Thursday, December 14, 2017 at 12:11 PM
**To:** The People Team <peopleteam@guardanthealth.com>
**Subject:** Employment Verification for Jill Beckman

Hello, I received a phone call today from a lady with the last name of Patell. I do believe it was for this employment I have been trying to verify but I can't be certain; because the front desk never gave her the person's name I wanted her to look at. I did send a fax over on the 7th and have not received anything back. If someone could please email me back to tell me the process to verify this employment that would be greatly appreciated.

**DEFENDANT'S EXHIBIT**

19

PENGAD 800-631-6989

Thank you so much for your help!

Courtney Metzgar
Verification Specialist
Justifacts Credential Verification
5250  Logan Ferry Road, Murrysville, PA 15668
Phone: 412-712-1593

Notice: This email and any files transmitted within it may contain confidential or privileged and exempt information.
This message is intended solely for the use of the individual or entity to whom it is addressed.
If you have received this email in error, please immediately:
1) notify us by returning it to the sender and
2) delete this copy from your computer system. Thank you.

Notice: This email and any files transmitted within it may contain confidential or privileged and exempt information.
This message is intended solely for the use of the individual or entity to whom it is addressed.
If you have received this email in error, please immediately:
1) notify us by returning it to the sender and
2) delete this copy from your computer system. Thank you.

Confidential

# Justifacts Background Check Authorization Waiver

Authorization to Conduct Background Investigation

I hereby authorize Justifacts Credential Verification, Inc, an Agent for **COMPANY NAME REDACTED FOR PRIVACY** to ascertain information regarding my background to determine any and all information of concern to my record and I release employers and persons named in my application from all liability for any damages on account of his/her furnishing said information. I understand that this form indicates that a background search will be conducted and that this is my notification of that intent. I understand that the purpose of this background investigation is to determine my suitability for employment and may elicit information on my character, general reputation, personal characteristics and mode of living.

Additionally, you are hereby authorized to make any investigation of my personal history, motor vehicle records, educational background, employment history, and criminal records through an investigative or bureau of your choice. I authorize the release of this information by the appropriate agencies to the investigating service. I understand that my consent will apply throughout my employment, unless I revoke or cancel my consent by sending a signed letter or statement to The Company at any time, stating that I revoke my consent and no longer allow The Company to obtain consumer or investigative consumer reports about me.

Applicant Information

Current Name

| **First Name** | **Last Name** | **Middle Name** |
|---|---|---|
| Jill | Beckman | Melissa |

**Social Security #**         **Date of Birth** *(MM/DD/YYYY)*                **Gender**
**BLOCKED**                    **BLOCKED**                                     **BLOCKED**

*Check Here if you do not have a Social Security Number*

By selecting **AGREE** below, I acknowledge that I am creating an electronic signature and that I understand it will be legally binding and enforceable as the legal equivalent of a handwritten signature.

## ⊙ AGREE     ○ DISAGREE

**Instructions for using the following online signature box:** Place the cursor inside the signature box. Depress the left mouse button at the point where you would like to begin drawing your signature. Hold the left mouse button depressed while you draw. Release the mouse button between words. Use the entire area of the signature box. On slower computers, you may need to draw more slowly to allow the computer to keep up. Obviously, a signature submitted in this fashion will not exactly match your handwritten signature however please try to give your best effort. Providing a signature in this fashion will decrease the time it takes to complete your background check, assuming one is requested. This in turn will improve The Company's hiring process overall. NOTE: If the signature panel does not work for you or does not appear, please ensure that you completed the **AGREE/DISAGREE** selection above then proceed with the process. Justifacts will reach out to you in the event that we need a full wet signature.

## Signature: *

*Jill Beckman*

Confidential                                                                                                    GH 000400

The information provided and obtained from the background verification process will be used for employment purposes only and will not be shared with any other party.

☐ **California, Minnesota & Oklahoma Residents Only: Please check this box if you would like a copy of the background check mailed to you.** Minnesota and Oklahoma residents will receive a copy direct from Justifacts or its designee. California residents may receive a copy from either the prospective employer or Justifacts.

**NOTICE:** Under federal law, you have the right to request disclosure of the nature and scope of our investigation by providing us with a written request within 60 days of our background investigation.

Subscriber certifies that consumer reports, as defined by the Fair Credit Reporting Act, 15 U.S.C. 1681 at seq. ("FCRA"), will be ordered only when intended to be used as a factor in establishing a consumer's eligibility for employment and that consumer credit information will be used for no other purposes. It is recognized and understood that the FCRA provides that anyone "who knowingly and willfully obtains information on a consumer from a consumer reporting agency" (such as Justifacts) "under false pretenses shall be fined not more than $2,500 or imprisoned not more than two years or both.

**** SUBMITTED BY **JILL BECKMAN** ON **12-06-2017 04:12:17 EST** ****

Close Window

# Justifacts Credential Verification Inc.



**5250 Logan Ferry Road**
**Murrysville, PA 15668**
**Phone: 1-800-356-6885 or (412) 798-4790**
**Fax: 412-798-4799**

-- Request Date: 12/14/2017

| | | | |
|---|---|---|---|
| Attention: | | File No: | 2259742 |
| Recipients Fax No: | | Applicant: | Jill Melissa Beckman |
| Company: | Guardant Health, Inc. | Maiden/AKA: | |
| Please Return fax to: | 412-798-4799 | SSN: | ▓▓▓▓▓▓▓ |
| | | DOB: | Contact me for D.O.B |

The applicant named above claims employment with your firm.  See applicant's attached waiver authorizing the release of employment information.

**Thank you for providing as complete and accurate information as possible, including full dates (month/day/year), leaving no spaces blank.**

| Description | Data Supplied By Applicant | Your Records |
|---|---|---|
| Dates of Employment(mm/dd/yy) | 09 / 2016 - 10 / 2017 | * (mm/dd/yy) to (mm/dd/yy) |
| Job Title | Account Executive | * |
| Hourly Rate or Annual Base Salary | | * |
| Additional Compensation (i.e., bonus, commission, overtime) | | * |
| Reason for Leaving | **Redacted** | * |

Company Address:  _____

       Street Address               City             State / Zip

How was this information verified?(check all that apply)___Name___ Date Of Birth ___ SSN

         Other (please specify):_____

Is this employee eligible for rehire?  ____ YES  ____ NO

If not, please specify the reason:  _____

If any information was not provided, please  ___ Per company policy  ___ Lack of records ___ Information
check why?  was purged  ___ Not privy to this information

**** Please rush this request - THANK YOU!!!! ****

Please return form to Courtney Metzgar by fax: 412-798-4799 or by email: cmetzgar@justifacts.com AND
please be sure to include your  name, title, date, and signature below.

| | | | |
|---|---|---|---|
| | | | |

* NAME (Type or Print)     * SIGNATURE     * TITLE     * DATE

                       * required information

Confidential



Justifacts Credential Verification Inc.
Karen Cook
5250 Logan Ferry Road
Murrysville, PA 15668
kcook@justifacts.com
Phone: 800-356-6885 x1549
Fax: 412-376-9204

| Report Number | Date Received | Date Complete | Account Manager |
|---|---|---|---|
| 2259742 | 12-06-2017 | 12-15-2017 | Karen Cook |

| Company: | Bayer U.S. LLC |
|---|---|
| Contact: | Julia Henderson |
| Address: | 100 Bayer Rd., Pittsburgh, PA 15205 |
| Phone Number: | 412-777-2033 |
| Email Address: | julia.henderson@bayer.com |

| Applicant Information |
|---|

| Name | Social Security Number |
|---|---|
| Jill Melissa Beckman | ###-##-9730 |

| Gender | Date of Birth |
|---|---|
| FEMALE | |

| Bayer Location | Cost Center | Req Number |
|---|---|---|
| Pharmaceuticals | J112569952 | 9690 |

| Current Addresses |
|---|
| 6900 Spencer Lake Road |
| Medina, OH  44256 |

| Previous Addresses |
|---|
| Latimore Road , Shaker Heights, OH  44122 |

| Summary of Verifications Requested | | | |
|---|---|---|---|
| Description | Rec Date | Comp Date | Status |
| SOCIAL SECURITY ADDRESS REPORT: ONETRACE/ONEVALIDATION | 12-06-17 | 12-06-17 | Complete |
| FELONY AND MISDEMEANOR CRIMINAL SEARCH (COUNTY COURT LEVEL): MEDINA COUNTY, OH NAME: JILL BECKMAN | 12-06-17 | 12-07-17 | Complete/Clear |
| FELONY AND MISDEMEANOR CRIMINAL SEARCH (COUNTY COURT LEVEL): MEDINA COUNTY, OH NAME: JILL JAMES | 12-07-17 | 12-07-17 | Complete/Clear |
| NATIONAL CRIMINAL DATABASE: NATIONAL NAME: JILL BECKMAN | 12-06-17 | 12-07-17 | Complete/Clear |



DEFENDANT'S
EXHIBIT
20

BECKMAN 000342

| | | | |
|---|---|---|---|
| NATIONAL CRIMINAL DATABASE: NATIONAL NAME: JILL JAMES | 12-06-17 | 12-07-17 | Complete/Clear |
| FACIS LEVEL 1 SEARCH: NATIONAL NAME: JILL BECKMAN | 12-06-17 | 12-06-17 | Complete/Clear |
| FACIS LEVEL 1 SEARCH: NATIONAL NAME: JILL JAMES | 12-06-17 | 12-07-17 | Complete/Clear |
| DRIVING RECORD CHECK: OH | 12-06-17 | 12-07-17 | Complete/Adverse |
| PAST EMPLOYMENT - GUARDANT HEALTH, INC. | 12/06/17 | 12/15/17 | Complete/Adverse |
| PAST EMPLOYMENT - ASTRAZENECA PHARMACEUTICALS | 12/06/17 | 12/07/17 | Complete/Clear |
| PAST EMPLOYMENT - NOVARTIS PHARMACEUTICALS | 12/06/17 | 12/07/17 | Complete/Clear |
| CONFIRMATION OF DEGREE - KENT STATE UNIVERSITY | 12/06/17 | 12/07/17 | Complete/Clear |

### SOCIAL SECURITY ADDRESS REPORT: ONETRACE/ONEVALIDATION

| - Social Security Number Validation - | |
|---|---|
| Deceased: | NO |
| Valid SSN: | YES |
| Response: | This is a Valid Social Security Number. |
| State Issued: | Ohio |
| Issued Between: | 1973 and 1975 |

| | | | | | Times | Dates Reported | |
|---|---|---|---|---|---|---|---|
| | - Names Found - | | | | | | |
| # | Last | First | Middle | | Reported | From | To |
| 1) | BECKMAN | JILL | M | | 5 | 4/1986 | 12/2017 |
| 2) | JAMES | JILL | M | | 5 | 4/1986 | 12/2017 |

| | - Addresses Found - | | | | |
|---|---|---|---|---|---|
| # | Address | County | Times Reported | Dates Reported | |
| | | | | From | To |
| 1) | 6900 SPENCER LAKE RD MEDINA, OH 44256 | Medina | 1 | 11/1992 | 12/2017 |
| 2) | 3770 HILLBROOK RD UNIVERSITY HEIGHTS, OH 44118 | Cuyahoga | 1 | 09/1990 | 06/2005 |
| 3) | 345 SPRINGBROOK DR 108 MEDINA, OH 44256 | Medina | 2 | 07/1986 | 05/2004 |
| 4) | 3701 LATIMORE RD SHAKER HEIGHTS, OH 44122 | Cuyahoga | 1 | 04/1986 | 01/2003 |
| 5) | 224 W WASHINGTON ST MEDINA, OH 44256 | Medina | 1 | 06/1992 | 12/1993 |
| 6) | PO Box 1263 MEDINA, OH 44258 | Medina | 1 | 07/1992 | 07/1992 |

BECKMAN 000343

| Additional Information | |
|---|---|
| Notes: | Please Note: This search is used to locate names and addresses associated with a social security number.  Although this search does verify that the social security number  is valid, it does not verify that the social security number provided belongs to the applicant.  If you would like a Consent Based Social Security Search,  which verifies that this person's name matches the social security number provided, please contact your Account Manager. |

## Criminal Records Check

| FELONY AND MISDEMEANOR CRIMINAL SEARCH (COUNTY COURT LEVEL): Medina COUNTY, OH | |
|---|---|
| NAME SEARCHED: | Jill Beckman |
| RESULTS: | COMPLETE/CLEAR |

On 12-07-2017, using the predominately searched index* available in the Common Pleas Court, criminal records were searched from 2010 to 2017 for the name Jill Beckman. Using the information provided, the records were clear of felonies and misdeamenors.

| FELONY AND MISDEMEANOR CRIMINAL SEARCH (COUNTY COURT LEVEL): Medina COUNTY, OH | |
|---|---|
| NAME SEARCHED: | JILL JAMES |
| RESULTS: | COMPLETE/CLEAR |

On 12-07-2017, using the predominately searched index* available in the Common Pleas Court, criminal records were searched from 2010 to 2017 for the name JILL JAMES. Using the information provided, the records were clear of felonies and misdeamenors.

| NATIONAL CRIMINAL DATABASE: National | |
|---|---|
| NAME SEARCHED: | Jill Beckman |
| RESULTS: | COMPLETE/CLEAR |

On 12-07-2017 records were searched in the National Criminal Database and no records were found for Jill Beckman, using the name & date of birth as provided. This search is comprised of the National Criminal Information Scan (NCIS); Offenderscan sex offender registry database & the Sentinel sanction/watch list database. This search includes information from state courts, local arresting agencies, department of corrections information, sex offender records for all 50 states, various terrorist watchlists (e.g. OFAC, FBI, Interpol), most wanted lists (e.g. BATF, DEA, FBI, ICE), sanction lists (e.g. FDA, OIG, GSA, FDIC, OCC, NCUA, OTS) and a variety of other state, national and international sanctions lists
To review the current source list, please refer to
http://www.justifacts.com/pdfs/national_criminal_database_v2.pdf.

BECKMAN 000344

| NATIONAL CRIMINAL DATABASE: National | |
|---|---|
| NAME SEARCHED: | JILL JAMES |
| RESULTS: | COMPLETE/CLEAR |

On 12-07-2017 records were searched in the National Criminal Database and no records were found for JILL JAMES, using the name & date of birth as provided. This search is comprised of the National Criminal Information Scan (NCIS); Offenderscan sex offender registry database & the Sentinel sanction/watch list database. This search includes information from state courts, local arresting agencies, department of corrections information, sex offender records for all 50 states, various terrorist watchlists (e.g. OFAC, FBI, Interpol), most wanted lists (e.g. BATF, DEA, FBI, ICE), sanction lists (e.g. FDA, OIG, GSA, FDIC, OCC, NCUA, OTS) and a variety of other state, national and International sanctions lists
To review the current source list, please refer to
http://www.justifacts.com/pdfs/national_criminal_database_v2.pdf.

| FACIS LEVEL 1 SEARCH: National | |
|---|---|
| NAME SEARCHED: | Jill Beckman |
| RESULTS: | COMPLETE/CLEAR |

On 12-06-2017, using the information as provided , the name Jill Beckman was searched in the Fraud and Abuse Control Information System (FACIS) database and no records were found.  The Level 1 FACIS database is a compilation of sanction information as taken by the OIG, GSA, FDA, DEA and other federal agencies. The information reported in this level meets the government's minimum requirements for sanction screening as set forth in the OIG's Compliance Program Guidance.

| FACIS LEVEL 1 SEARCH: National | |
|---|---|
| NAME SEARCHED: | JILL JAMES |
| RESULTS: | COMPLETE/CLEAR |

On 12-07-2017, using the information as provided , the name JILL JAMES was searched in the Fraud and Abuse Control Information System (FACIS) database and no records were found.  The Level 1 FACIS database is a compilation of sanction information as taken by the OIG, GSA, FDA, DEA and other federal agencies. The information reported in this level meets the government's minimum requirements for sanction screening as set forth in the OIG's Compliance Program Guidance.

\* Justifacts Credential Verification, Inc conducts criminal record searches using the predominately searched index in the specified jurisdiction. This index is typically accessed via the public access computer terminal. Records are searched back a minimum of seven years, however, the majority of court indexes go back much further, with each jurisdiction maintaining different time periods within their record databases. All legally reportable information found during the course of a search is reported, subject to any reporting restrictions of the Fair Credit Report Act (FCRA), state law, and/or limitations set on a client-specific basis.

## Driving Record

### State Search: Ohio

**Motor Vehicle Record**
**Applicant Information**

| | |
|---|---|
| AccountNumber | D0779 |
| Version | SoftMvr2_0 |
| DateOfRequest | 12/06/2017 |
| LicenseNumber | RT793459 |
| LicenseState | OH |
| LicenseStateName | OHIO |
| FullName | BECKMAN, JILL M |
| LastName | BECKMAN |
| FirstName | JILL |
| MiddleName | M |
| DateOfBirth | |
| Gender | F |
| Height | 503 |
| Weight | 115 |
| EyeColor | HAZEL |
| HairColor | BROWN |
| Address | 6900 SPENCER LAKE |
| City | MEDINA |
| State | OH |
| Zip | 44256 |
| Product | MVR |
| MvrStatus | 3 |
| MvrScore | 1 |
| Xmlversion | 0 |
| QuoteBack | 2259742 |
| LicenseType | PERSONAL |
| Class | D |
| ClassDescription | D - OPERATOR |
| LicenseStatus | VALID |
| LicenseStatusDescription | VALID |
| DateIssued | 11/22/2017 |
| Expiration | 11/23/2021 |

BECKMAN 000346

| | |
|---|---|
| Restrictions | NONE |
| RestrictionDescription | NONE |

**LicenseInfos**

**LicenseInfo**

| | |
|---|---|
| Class | D |
| ClassDescription | D - OPERATOR |
| LicenseType | PERSONAL |
| LicenseStatus | VALID |
| | VALID |
| LicenseStatusDescription | |
| | VALID |
| LicenseStatusCategory | |
| OriginalIssueDate | |
| DateIssued | 11/22/2017 |
| Expiration | 11/23/2021 |
| Endorsements | |
| EndorsementDescription | |
| Restrictions | NONE |
| RestrictionDescription | NONE |

**Violations**

**Violation**

| | |
|---|---|
| IssueDate | 08/29/2017 |
| ConvictionDate | 09/26/2017 |
| Points | 0 |
| CityLocation | OHIO |
| Jurisdiction | OH |
| Court | AUGLAIZE MUNICIPAL COURT |
| CommercialVehicle | N |
| OrderNumber | 1706735A |
| EventType | VIOLATION |
| Description | TAG/STICKER VIOLATION |
| ACD | - |
| AVD | DD03 |

**FooterStateInfo**

| | |
|---|---|
| Text | If you have any questions regarding the content of this Driving History Report |
| Text | please contact Customer Care at 888-947-2622. Thank you |

Employment Record

BECKMAN 000347

## PAST EMPLOYMENT - GUARDANT HEALTH, INC.

| | |
|---|---|
| Company Phone Number: | (855) 698-8887 |
| Company Address: | , Redwood City, CA |
| Respondent: | Davina Patel, People Operations Associate |
| Location: | 505 Penobscot Dr, Redwood City, CA 94063 |
| Respondent Phone Number: | (855) 698-8887 |
| Email Address: | peopleteam@guardanthealth.com |
| Verification Obtained By: | FAX |
| Verification Verified By: | NAME, DOB AND SSN |

| < Applicant Info > | | < Respondent Info > |
|---|---|---|
| 09 / 2016 | Start Date | 09/15/2016 |
| 10 / 2017 | End Date | 10/03/2017 |
| Account Executive | Job Title | (verified) |
| ! Downsized.  The Cleveland market is no longer viable or being supported with an Account Executive.  Pittsburgh (the other part of my territory) is now being covered by the W. Virginia representative | Reason For Leaving | ! Misconduct |

Would you rehire?
   ! No
If not, why?
   ! She was terminated for misconduct.
Additional Comments:
   Please note that no further information regarding the reason for rehire ineligibility was provided on the return fax.

The above information was verified on: 12/15/17 08:23 AM
Reviewed by Justifacts Quality Control on: 12/15/17 09:11 AM

## PAST EMPLOYMENT - ASTRAZENECA PHARMACEUTICALS

| | |
|---|---|
| Company Phone Number: | (800) 236-9933 |
| Company Address: | (not provided), Wilmington, DE |
| Respondent: | AstraZeneca & MedImmune, Automated Verification Service |
| Location: | 1800 Concord Pike, Wilmington, DE 19850 |
| Verification Obtained By: | VERIFICATION SERVICE |
| Verification Verified By: | VERIFICATION SERVICE |

| < Applicant Info > | | < Respondent Info > |
|---|---|---|
| 04 / 2015 | Start Date | (see comments) |
| 05 / 2016 | End Date | 05/02/2016 |
| Clinical Oncology Specialist | Job Title | (not released) |
| Separation - I chose to leave for various reasons, and was supported by AZ with this decision | Reason For Leaving | (not released) |

BECKMAN 000348

Would you rehire?
(not released)

Additional Comments:

Please note that this company required an automated service (The Work Number) for all verifications. This automated service provided dates of employment only. The automated service did not provide an original hire date; however, a most recent hire date of 04/13/2015 was provided. Click the "<-- View Report -->" link to view this report.

<-- view report -->

The above information was verified on: 12/07/17 08:36 AM

Reviewed by Justifacts Quality Control on: 12/07/17 08:37 AM

| PAST EMPLOYMENT - NOVARTIS PHARMACEUTICALS | |
|---|---|
| Company Phone Number: | (862) 778-8300 |
| Company Address: | (not provided), East Hanover, NJ |
| Respondant: | Novartis Pharmaceuticals Corporation, Automated Verification Service |
| Location: | One Health Plaza, East Hanover, NJ 07936 |
| Verification Obtained By: | VERIFICATION SERVICE |
| Verification Verified By: | VERIFICATION SERVICE |

| < Applicant Info > | | < Respondent Info > |
|---|---|---|
| 12 / 2012 | Start Date | 12/21/2012 |
| 04 / 2015 | End Date | 04/06/2015 |
| Sr. Respiratory Sales Specialist | Job Title | Sr Sales Specialist |
| Opportunity to get back into Oncology, and join AstraZeneca | Reason For Leaving | (not released) |

Would you rehire?
(not released)

Additional Comments:

Please note that this company required an automated service (The Work Number) for all verifications. This automated service provided dates of employment and job title only. Click the "<-- View Report -->" link to view this report.

<-- view report -->

The above information was verified on: 12/07/17 08:33 AM

Reviewed by Justifacts Quality Control on: 12/07/17 08:34 AM

BECKMAN 000349

## Confirmation of Degree

| CQD - Kent State University | |
|---|---|
| Name While Attending School: | Jill M Beckman |
| School Name: | Kent State University |
| School Address: | Kent, OH |
| School Type: | UNIVERSITY |
| Information Provided By: | Kent State University |
| Department/Title: | Automated Verification Service |
| Phone Number: | (not provided) |
| Verification Obtained By: | VERIFICATION SERVICE |
| Verification Verified By: | VERIFICATION SERVICE |

| < Applicant Info > | | < Respondent Info > |
|---|---|---|
| 09 / 1985 | Start Date | 08/01/1985 |
| 12 / 1989 | End Date | 12/16/1989 |
| 1989 | Graduation Year | (Verified) |
| Bachelor's: Rhetoric and Communication | Degree Received | BACHELOR OF ARTS: MAJOR(S): RHETORIC AND COMMUNICATION |

is the accrediting agency recognized by the U.S. Department of Education or the Council for Higher Education Accreditation?

Yes

Additional Comments:

Information for this applicant was obtained from the National Student Clearinghouse. In certain circumstances, the National Student Clearinghouse may uncover additional information about an applicant which might include additional degrees, minor fields of study, and/or information about the applicant's major course of study. Please click the link below to view the complete report. Note: 1 record(s) have been found.

<-- view report -->

The above information was verified on: 12/07/17 08:39 AM
Reviewed by Justifacts Quality Control on: 12/07/17 08:43 AM

This completes the information requested for Jill Melissa Beckman.

If you have any questions regarding the above information, please do not hesitate to contact us.

Sincerely Yours,

Karen Cook
Account Manager

- Click here to view/print Notice to users of Consumer Reports -

- Click here to view/print Applicant Summary of Rights -

BECKMAN 000350

| Bayer U.S. LLC | Jill Melissa Beckman |
|---|---|

This information is furnished in response to an inquiry for the purpose of screening. It has been obtained from sources deemed reliable. However, the accuracy of this information is not guaranteed by this organization. Information contained herein should not be the sole determination in evaluation of this individual. The inquirer has agreed to indemnify and hold reporting bureau harmless from claims or damages arising from misuse of this information, including Attorney fees incurred by the responsible bureau in connection with any such claims, and this report is furnished in reliance upon that indemnity. You must hold the information in strict confidence and comply with the provisions of Public Law 91-508, the Fair Credit Reporting Act. Quotes used for references from supervisors and others are to the best of our ability and may have been slightly modified to correct grammar or complete sentences. The language of this interview may have been changed slightly in the interest of clarity and continuity.

Copyright © by Justifacts Credential Verification, Inc. 2000-2018; All rights reserved.

BECKMAN 000351

Bayer Applicant Portal 

**100 Bayer Road, Pittsburgh, PA. 15205**

December 27, 2017

Jill Melissa Beckman
6900 Spencer Lake Road
Medina, OH 44256

Dear Jill:

Thank you for your interest in employment with BAYER U.S. LLC.  Based in whole or in part on our
hiring criteria, including information recently obtained in a consumer report completed by Justifacts
Credential Verification, Inc., BAYER U.S. LLC may be unable to extend an offer of employment to you.
Enclosed please find a copy of your consumer report and a copy of your rights under the Fair Credit
Reporting Act.

The Fair Credit Reporting Act allows applicants a reasonable amount of time to dispute the information
contained in a background investigation.  If you wish to dispute the accuracy or completeness of any
information contained in your consumer report, please contact the Justifacts Compliance Officer at the
address or phone number listed below within ten (10) business days of receipt of this letter:

> **Justifacts Credential Verification, Inc.**
> **FCRA Compliance**
> **5250 Logan Ferry Road**
> **Murrysville, PA 15668**
> **Phone (800) 356-6885**
> **https://www.justifacts.com/**

Please be advised that Justifacts Credential Verification, Inc. does not make the hiring decisions and is
unable to provide specific reasons for them.  Thank you for your interest in our company.

BAYER U.S. LLC

Report Number: 2259742
Page: 1



DEFENDANT'S
EXHIBIT
21

GH-BAYER 0026



**From:** Jill Beckman <jillbeckman1123@gmail.com>
**Sent:** Saturday, December 30, 2017 9:28
**To:** The People Team; Amelia Merrill; davina.patel@guardanthealth.com
**Subject:** Re: Employment Verification

Hi People Team, Amelia, and Davina,

Thank you again for responding to Justifacts. I received the results, and saw that Davina did not follow the below terms of our agreement, and provided additional information about my termination. Most companies do exactly what is noted below, and do not respond to "Reason for Leaving" or "Would you Rehire?"
**I understand that employee references come through the People Operations Team and cover last employee title, date of hire and date of separation only.** Should I have any questions I am to contact the People Operations Team.
I may not be hired for this new job due to Davina stating I was terminated for misconduct. Will you please respond, and confirm that any future inquiries will cover what is noted above "**last employee title, date of hire and date of separation only**?"

Thank you.

Jill


On Dec 18, 2017, at 5:24 PM, The People Team <peopleteam@guardanthealth.com> wrote:

Hi Jill, you are all set. It was sent it last week and Aisha confirmed today. Good luck with your new role.

Happy Holidays.

Gail

-----Original Message-----
From: Jill Beckman [mailto:jillbeckman1123@gmail.com]
Sent: Monday, December 18, 2017 11:54 AM
To: The People Team <peopleteam@guardanthealth.com>
Subject: Employment Verification

Hi People Team,

Happy Holidays!



# Bayer: Applicant Portal



**100 Bayer Road, Pittsburgh, PA. 15205**

January 11, 2018

Jill Melissa Beckman
6900 Spencer Lake Road
Medina, OH 44256

Dear Jill:

This letter is to notify you that BAYER U.S. LLC is unable to extend an offer of employment to you.  This decision was made based in whole or in part on information received in a consumer report from Justifacts Credential Verification, Inc. (Justifacts).  Please note that Justifacts does not make employment decisions for BAYER U.S. LLC and is unable to provide you with specific reasons for them.

You have the right to dispute the accuracy or completeness of any information in your consumer report by contacting Justifacts.  You may also obtain a free copy of your consumer report directly from Justifacts if you make your request within sixty (60) days of receipt of this notification.

For more information on how to request a copy of your consumer report, how to dispute the accuracy or completeness of any information in your consumer report or to obtain additional information related to the Fair Credit Reporting Act, please contact the Justifacts Compliance Officer at the following address or phone number:

> **Justifacts Credential Verification, Inc.**
> **FCRA Compliance**
> **5250 Logan Ferry Road**
> **Murrysville, PA 15668**
> **Phone (800) 356-6885**
> **https://www.justifacts.com/**

Thank you for your interest in our company.

BAYER U.S. LLC

*Julia Henderson*

Report Number: 2259742
Page: 1



DEFENDANT'S
EXHIBIT
23

BECKMAN 000341